1  WHATLEY DRAKE & KALLAS, LLC
   Joe R. Whatley, Jr., Esq.
2  jwhatley@wdklaw.com
   Edith M. Kallas, Esq.
3  ekallas@wdklaw.com
   1540 Broadway, 37ᵗʰ Floor
4  New York, NY 10036
   Tel: (212) 447-7070
5  FAX: (212) 447-7077

6  EMERSON POYNTER LLP
   John G. Emerson, Esq.
7  jemerson@emersonpoynter.com
   830 Apollo Lane
8  Houston, Texas 77058-2610
   Tel: (281) 488-8854
9  FAX: (281) 488-8867

10  JIGARJIAN LAW OFFICE
    Robert A. Jigarjian, Esq. (SBN 171107)
11  jigarjianlaw@gmail.com
    128 Tunstead Avenue
12  San Anselmo, CA 94960
    Tel: (415) 341-6660

13
    [ADDITIONAL COUNSEL ON SIGNATURE PAGE]
14
    Attorneys for Plaintiffs
15

16          **UNITED STATES DISTRICT COURT**

17      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

18  **LINDSEY WEBB, JAYME**          **Case No. 2:08-CV-07367-GAF-MANx**
    **SANCHEZ, KINA ABRAMS,**
19  **ANASTASIA BOOTH, AMYMUIR**     **CLASS ACTION**
    **and NANCY MUIR, individually**
20  **and on behalf of all others similarly**   **THIRD AMENDED CLASS ACTION**
    **situated,**                    **COMPLAINT FOR VIOLATION OF**
21                                   **CALIFORNIA BUS. & PROF. CODE**
           **Plaintiffs,**           **SECTIONS 17200 AND 17500,** *ET*
22                                   ***SEQ.,* BREACH OF IMPLIED**
           **v.**                    **WARRANTIES, AND VIOLATION**
23                                   **OF MAGNUSON-MOSS WARRANTY**
    **CARTER'S, INC.; PACIFIC**      **ACT**
24  **CONCEPT INDUSTRIES (USA)**
    **LLC; PACIFIC CONCEPT**
25  **INDUSTRIES LIMITED; AND**      **DEMAND FOR JURY TRIAL**
    **AVERY DENNISON, INC.**
26
           **Defendants.**
27

28
                                 **ORIGINAL**

                    1

───────────────────────────────────────────────

FILED
CLERK, U.S. DISTRICT COURT
FEB - 1 2010
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Plaintiffs Lindsey Webb, Jayme Sanchez, Kina Abrams, Anastasia Booth, Amy Muir and Nancy Muir ("Plaintiffs"), individually and on behalf of all other persons similarly situated, file this Third Amended Class Action Complaint (the "Complaint") and where specifically so identified allege upon personal knowledge matters pertaining to themselves and their own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by Plaintiffs' counsel which facts are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery:

## I.

## INTRODUCTION

1.     This is a nationwide class action lawsuit brought on behalf of Plaintiffs Lindsey Webb, Jayme Sanchez, Kina Abrams, Anastasia Booth, Amy Muir and Nancy Muir, and other similarly situated individuals (the "Plaintiffs") against Carter's Inc. ("Carter's"),  Avery Dennison, Inc. ("Avery Dennison"), Pacific Concept Industries (USA), LLC and Pacific Concept Industries Limited (referred to herein collectively as "Pacific Concept").  Specifically, Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure to redress Defendants' failure to disclose and provide adequate warning that the infant and children's tag-less clothing they designed, manufactured, distributed and sold to the consuming public had, prior to distribution and sale to consumers, failed tests which showed that they contained toxic chemicals such as Bis(2-ethylhexyl)phthalate ("DEHP") and formaldehyde, which were known hazardous substances that cause, *inter alia,* severe skin irritations such as the ones incurred by Plaintiffs' children.  (*See* Exhibits A, B C, & D to Plaintiffs' Third Amended Complaint, Photographs of Plaintiffs' Children's skin irritations caused by the clothing at issue).  Defendants further failed to disclose that in December, 2007, while the defective clothing was still being sold throughout the United States, Defendant Avery, in cooperation with Defendant Carter's, retained an independent test agency to test sample garments to

2

determine whether they were skin irritants and received a positive test report clearly indicating that the tag-less labels did contain skin irritants which would destroy human skin cells.  Defendants further failed to disclose that starting in November 2007, Carter's received a steady stream of reports – now totaling over three thousand – of children injured by the tag-less labels.  Defendants were in exclusive possession of the knowledge about the presence of hazardous chemicals in the tag-less labels on the affected clothing, the test reports proving that the chemicals in the labels -were skin irritants, and the thousands of reports linking the tag-less labels to rashes, blisters, burns and other skin wounds.  There are no disclosures on any such products about the presence of such hazards directly linked to clothing intended to be worn by infants and children, who are more susceptible to chemical toxicity than adults.  Defendants' unlawful, unfair and fraudulent business acts and practices as detailed below related to the distribution and sale of  Carter's apparel products containing heat-transferred or "tag-less" labels (referred to herein as "defective clothing" or "defective apparel") without disclosing the presence of toxic chemicals that were unsafe for children to be exposed to, were likely to have misled the public into believing the defective apparel was safe, did not contain toxic and hazardous chemicals (such as DEHP and formaldehyde) and were suitable for their intended purpose, when they were not.

2.      Carter's Inc. and its wholly owned subsidiaries (collectively "Carter's" or "the Company") design, source, market and sell branded children's wear under the *Carter's*, *Child of Mine*, *Just One Year*, *OshKosh*, and related brands.   In its 2008 Annual Report, Carter's focuses on the fact that parents place special trust in them (emphasis added):

> **We are the largest branded marketer in the United States of apparel exclusively for babies and young children.** We own two of the **most highly recognized and most trusted brand names** in the children's apparel

3

industry, *Carter's* and *OshKosh*. Established in 1865, our **Carter's brand is recognized and trusted by consumers for high-quality apparel for children sizes** newborn to seven.

3.    Carter's reports that its products are sourced through contractual arrangements with manufacturers worldwide for wholesale distribution to major retailers, including the mass channel retailers like Babies R Us, Target, Wal-Mart, Kohl's and Sears, and sold directly to the public through its several hundred Carter's and OshKosh retail and outlet stores.

4.    Under its Carter's brand, the Company designs, sources and markets an array of products, primarily for sizes newborn to seven.   Carter's brand baby products include bodysuits, undershirts, towels, washcloths, receiving blankets, layette gowns, bibs, caps and booties. Carter's sells a range of baby products for newborns, primarily made of cotton.  Carter's brand sleepwear products include pajamas, cotton long underwear and blanket sleepers in sizes 12 months to size seven.  Carter's describes itself on its website, www.Carters.com, as "the largest brand of baby and young children's apparel."  Carter's has publicly stated that it is aware parents rely on them to provide trusted products and focuses its efforts on taking care of babies and small children, and that as a result children's safety is one of its top priorities.  Because Carter's focuses and targets its efforts on infant clothing, it has undertaken a special duty and care to ensure its products do not expose such infants to harmful toxins if they can avoid doing so.

5.    Many garments in Carter's Fall 2007 line of clothing for infants and children ("Fall 2007 Line") had "tag-less" labels – labels placed in the area touching the upper back or neck of an infant or child which were chemically printed on the clothing.  Such labels replaced traditional sewn-on cloth labels.

6.    The tag-less labels used by Carter's on clothing in its Fall 2007 Line were produced by three companies – Avery Dennison, Pacific Concept and Inter-

4

Trend Global Packaging Co., Ltd. ("Inter-Trend"), a corporation organized and existing under the laws of Thailand with its principal place of business and executive offices located at 889 Thai CC Tower, 150 Room, 15th Floor, South Sathorn Road, Sathorn, Bangkok, 10120.   Inter-Trend is not a party to this litigation.

7.   Carter's knew by February 2007 – months before production and shipping of its Fall 2007 Line – that the tag-less labels to be used on that line contained phthalate levels that exceeded Carter's own published standards.

8.   Carter's had received at least one test report from a label vendor which prominently stated that the test was a "FAIL" for the presence of phthalates. Carter's did not follow up to change the formulation of the tag-less labels to remedy this phthalate problem or take any other action to address it.

9.   Carter's also knew in 2006 that the tag-less labels contained formaldehyde, a known skin irritant.  By early 2008, Carter's was aware that the formaldehyde standard for clothing designed for children under 36 months of age was a "negative result" – that is, a test result showing no formaldehyde – yet Carter's continued to ship clothing with tag-less labels that contained that chemical.

10.   In November 2007, Carter's began receiving unprecedented complaints from consumers linking the tag-less labels in the Fall 2007 line to skin irritation, blisters and burns on infants and young children.  These reports were so unusual and troubling that Carter's Chief Executive Officer convened a meeting with Avery, the manufacturer of the tag-less labels on the clothing that generated the first reports, after just three reports to discuss the issue.   Having never received a complaint about a tag-less label for any earlier line, Carter's received over three thousand consumer complaints about the tag-less labels on its Fall 2007 line.

11.   From the outset of Carter's investigation, Carter's top management has been focused on the tag-less label issue.  Jim Eidson, Carter's Vice President of Quality, commenced the investigation in November 2007 after receipt of the first

Third Amended Class Action Complaint                    Case No. 2:08-CV-07367-GAF (MANx)

few complaints, and met repeatedly with the Chief Executive Officer of Carter's, as well as other senior executives, to discuss the tag-less label issue.

12.    Despite this study stream of reports from consumers linking the tag-less labels from the Fall 2007 line to injuries from November 2007 through the entire year of 2008, Carter's made no effort to warn the public about the issue until forced by the Consumer Product Safety Commission to issue a public statement in October 2008.

13.    Janell Cleveland, the Carter's employee responsible for all consumer complaints, was sufficiently concerned about the flood of complaints about tag-less labels that she told Carter's General Counsel and Vice President of Quality in early 2008 that Carter's should issue a public statement warning members of the public about the problem.  Despite the fact that Fall 2007 line clothing was still on store shelves in the spring of 2008, she was told not to issue a public statement.

14.    The many consumer complaints linking skin injuries with the Fall 2007 tag-less labels have been corroborated by tests conducted at the direction of Carter's.  In November, 2007, Carter's asked its main label supplier, Avery, to test labels on two items of clothing. Avery directed North America Science Associates, Inc. ("NAMSA") to test tag-less labels on returned clothing to determine whether they met the International Organization for Standardization's ("ISO") standard for cytotoxicity – that is, toxicity to cells.

15.    NAMSA provided the test results in response to a subpoena by Plaintiffs; they show that testing conducted in early December, 2007, while the Fall 2007 Line was still being sold to consumers, confirmed that the tested tag-less labels failed ISO standards for cell toxicity – the standard that Defendants themselves selected as the proper measure for determining whether the labels were skin irritants.

16.    Avery has produced NAMSA reports in discovery but appears not to have provided the report establishing that tag-less labels on Carter's Fall 2007 line

6

---

1  failed ISO standards.   Nor has Avery provided any explanation for the failed

2  cytotoxicity test.

3      17.   In deposition testimony, Carter's Vice President for Quality initially

4  authenticated the test report establishing that the Fall 2007 labels failed ISO

5  standards for cell toxicity, after a lengthy private discussion with counsel, recanted

6  that testimony and claimed to have not received that documents from Avery.

7      18.   Carter's could have easily evaluated the positive test report had it

8  spoken with NAMSA but it did not do so, confining its discussions about the test to

9  representatives of Avery, the company with a contract with Carter's for production

10  of millions of said labels.

11      19.   The only professionals retained by Carter's in connection with its

12  investigation into the health problems caused by the Fall 2007 tag-less labels were

13  attorneys and a public relations firm.   Carter's never contacted any toxicologist,

14  chemist or other scientist to conduct an investigation into the problems caused by

15  the Fall 2007 labels.   Nor did Carter's retain any physician or medical expert.   In

16  interrogatory responses, Carter's claims to have consulted with a doctor about the

17  labels.   That doctor is the personal physician of Carter's Executive Vice President,

18  Charlie Whetzel, and has not provided any formal report or evaluation.

19      20.   In or around December 2008, in conjunction with the publication of a

20  joint message with the Consumer Product Safety Commission that that Commission

21  forced Carter's to issue to the public, Carter's published "A Message From Carter's

22  On Tag-Less Labels" on its website.   (Exhibit E to Plaintiffs' Third Amended

23  Complaint).   In addition to using the announcement to remind its customers that it

24  is supposedly "committed to being the **industry leader in product safety and**

25  **quality**" and admitting it "take[s] pride in knowing that **parents rely on us** to

26  provide trusted products that help make their lives simpler," the announcement

27  made the following specific misrepresentations regarding the defective apparel

28  distributed by Carter's that contains hazardous chemicals such as DEHP and

7

24.   Between 2006 and the present, Carter's, Avery Dennison and Pacific Concept knew of the defective nature of the infant and children's apparel and resulting risk of injuries, but by failing to disclose material facts about the safety of such products that by law they were obligated to disclose, engaged in conduct that was likely to mislead Plaintiffs and all other Class members, preventing them from making informed choices about the selection of apparel products containing heat-transferred or "tag-less" labels. As a result, consumers purchased clothing with tag-less labels containing toxic chemicals such as DEHP and formaldehyde and causing severe chemical burns, rashes and other injuries – defective clothing that reasonable consumers would likely never purchase if they had been provided full and adequate disclosure of the presence of its toxic, hazardous qualities and/or proven link to skin irritation and burns.

25.   Plaintiffs and all Plaintiff Class members seek compensatory and punitive damages for themselves, and all others similarly situated, as a result of their purchase and/or use of the defective apparel, which caused, may cause and/or continue to cause Plaintiffs and the Plaintiff Class members to suffer economic loss and other expenses.

26.   Further, Plaintiffs and all Plaintiff Class members seek equitable and other relief for themselves, and all others similarly situated, to compensate them, in whole or in part, for the economic issues that confront them as a result of their purchase and use of Carter's apparel products containing heat-transferred or "tag-less" labels including disgorgement, restitution including the return of any purchase price paid, interest on these amounts from the date of purchase, medical expenses, attorneys' fees and costs as well as any other legal or equitable relief to which Plaintiffs may be entitled and whatever further relief the Court deems just and proper under the circumstances.

///

///

9

## II.

## PARTIES

27.    On personal knowledge, Plaintiff Lindsey Webb is an individual consumer who, at all times material hereto, was and is a resident of the County of Los Angeles in the State of California, and a "citizen" of California.

28.    On personal knowledge, Plaintiff Jayme Sanchez is an individual consumer who, at all times material hereto, was and is a resident of Dallas, Texas, and a "citizen" of Texas.

29.    On personal knowledge, Plaintiff Kina Abrams is an individual consumer who, at all times material hereto, was and is a resident of Dexter, Michigan, and a "citizen" of Michigan.

30.    On personal knowledge, Plaintiff Anastasia Booth is an individual consumer who, at all times material hereto, was and is a resident of Columbia, Maryland, and a "citizen" of Maryland.

31.    On personal knowledge, Plaintiff Amy Muir is an individual, and at all times material hereto, was and is resident of Long Beach, California.

32.    On personal knowledge, Plaintiff Nancy Muir is an individual and at all times material hereto, was and is a resident of Winnetka, California.

33.    Defendant Carter's, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and executive offices located in The Proscenium, 1170 Peachtree Street NE, Suite 900, Atlanta, Georgia 30309. Plaintiffs believe this location is where the majority of its executive and administrative functions are performed. At all relevant times, Carter's Inc. was and is doing business within this District.

34.    Defendant Avery Dennison, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and executive offices located in the Miller Corporate Center, 150 North Orange Grove Boulevard, Pasadena, California 91103.  Plaintiffs believe this location is

10

where the majority of its corporate business activity takes place. At all relevant times, Avery Dennison was and is doing business within this District.

35. Defendant Pacific Concept Industries (USA), LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and executive offices located at 39 West 37th Street, Floor 17, New York, NY 10018. Pacific Concept Industries (USA) LLC designed and manufactured millions of defective tag-less labels for Carter's, which it then purposefully directed into the state of California. Pacific Concept Industries' Managing Director, John McGrath, maintains his offices at 541 Commerce Street, Building #4, Franklin Lakes, New Jersey 07417.

36. Defendant Pacific Concept Industries Limited is a corporation organized and existing under the laws of Hong Kong with its principal place of business and executive offices located at Tin On Industrial Building, 9th Floor, 777-779 Cheung Sha Wan Road, Cheung Sha Wan, Kowloon, Hong Kong. Pacific Concept Industries Limited designed and manufactured millions of defective tag-less labels for Carter's, which it then purposefully directed into the state of California. Pacific Concept Industries' Managing Director, John McGrath, maintains his offices at 541 Commerce Street, Building #4, Franklin Lakes, New Jersey 07417.

37. At all times herein mentioned, as detailed herein the employees of Defendants, their subsidiaries, affiliates and other related entities, were the agents, servants and employees of Defendants, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment in terms of the conduct at issue herein and the decision not to disclose material facts regarding the presence of unsafe chemicals in the infant clothes in question. Whenever reference in this Complaint is made to any act or transaction of Defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Defendants committed, were aware of, performed,

11

authorized, ratified and/or directed such act or transaction on behalf of said Defendants while actively engaged in the scope of their duties.

## III.

## <u>JURISDICTION AND VENUE</u>

38.     This Court has jurisdiction over this class action under 18 U.S.C. §1332(d), which under the provisions of the Class Action Fairness Act ("CAFA") explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a State different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.   Plaintiffs allege that the total claims of individual Class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).   The Plaintiffs are citizens of California, Texas, Michigan and Maryland, whereas, as set forth above, Defendant Carter's is a corporate citizen of either Georgia or Delaware.   Furthermore, Plaintiffs allege that this action is being brought on behalf of citizens in addition to those from California or Georgia, and that the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).   Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

39.     Venue is proper in this District under 28 U.S.C. §1391.   Defendant Carter's markets and sells apparel for babies and young children in this District and has availed itself of the laws and protection of the State of California.   Likewise, Defendant Avery Dennison's principal place of business and executive offices are located within this District.   Additionally, Plaintiff Webb purchased the defective apparel from a Carter's retail store within this District.

/ / /

/ / /

/ / /

12

# IV.

## FACTUAL BACKGROUND

**A.    Carter's Tag-less Clothing**

40.    Tag-less labeling was initiated and introduced into the market to allow for increased consumer comfort, branding opportunities, cost savings and security management.

41.    Typically, the tag-less label process involves the application of a tag, which is applied to a garment from a roll or cut single transfer in the presence of heat and pressure.

42.    Carter's tag-less labels are applied to the inside of its baby apparel in lieu of traditional hanging tags.  Carter's has utilized tag-less labels in its infant garments since 2005, and has redesigned such labels (including, *inter alia,* reformulating the ink used in the labels) on at least three occasions.

43.    Defendant Avery Dennison materially assists and works in concert with Carter's in designing, manufacturing and distributing apparel products containing tag-less labels.   In addition, based on its testing processes and manufacturing expertise, along with Carter's as the manufacturer of such products, Avery Dennison would have been in exclusive possession of the knowledge about the potential or actual presence of toxic chemicals in the infant tag-less clothing in question, as there are no disclosures on any such products about the presence of such chemicals.

44.    Carter's tag-less labels designed, manufactured and distributed with Avery Dennison's material assistance contain substances that have been identified by the state and federal governments to be hazardous to children's health when they are dermatologically exposed thereto, including the chemicals DEHP and formaldehyde.

/ / /

/ / /

13

**B.**   **Plaintiffs' Transactions**

   **1.**   **Lindsey Webb**

   45.   On personal knowledge, Plaintiff Webb alleges between 2007 and 2008, she purchased over fifty Carter's brand tag-less garments for her daughter, "KA" directly from Carter's retail stores (including Store 315 located in Irvine, California and other location in Ontario, California), as well as from Wal-Mart and Target.

   46.   On personal knowledge, Carter's clothing makes up ninety percent of KA's wardrobe.

   47.   On personal knowledge, since the time KA was approximately one-month old, she has suffered from a sore located between her shoulder blades on her upper back/lower neck.  This is the exact area where the Carter's tag-less label comes into contact with her skin.  (*See* Exhibit A to Plaintiffs' Third Amended Complaint).

   48.   On personal knowledge, KA's skin condition has made it extremely difficult and uncomfortable for her to sleep on her back, causing her to scream and sob when she is placed in this position.  The American Academy of Pediatrics recommends that in order to reduce the risk of Sudden Infant Death Syndrome (SIDS), infants should be placed for sleep in a supine position (wholly on the back) for every sleep.

   49.   On personal knowledge, the skin condition, which, contrary to Carter's announcement on its website (Exhibit E to Plaintiffs' Third Amended Complaint) did not clear up in a matter of days, has also caused Ms. Webb to consult with KA's pediatrician about the condition prior to, and during, KA's medical appointments and to expend monies as a result.

   50.   On personal knowledge, the treatment for the condition has included the purchase and use of various lotions and other prescription topical ointments that Ms. Webb would not have purchased had KA not been suffering from the severe

14

1   skin irritation caused by the defective apparel.  She was not aware of the presence of
2   such chemicals in these clothes, and if she had been told of these material facts or
3   that they might have been the likely cause of KA's discomfort, would never have
4   purchased such clothing.

5       **2.    Jayme Sanchez**

6       51.    On personal knowledge, between 2007 and 2008, Plaintiff Sanchez
7   purchased numerous pieces of Carter's brand tag-less garments for her infant son
8   "AS" directly from a Carter's outlet store (Store 783) in Allen, Texas, as well as a
9   Babies R Us store in Addison, Texas.

10      52.    On personal knowledge, when he was three months old, AS began
11  suffering from irritation and redness between his shoulder blades on his upper
12  back/lower neck.  This is the exact area where the Carter's tag-less label came into
13  contact with his skin.  (*See* Exhibit B to Plaintiffs' Third Amended Complaint).

14      53.    On personal knowledge, AS's skin condition made it extremely
15  difficult and uncomfortable for him to sleep on his back, causing him to scream and
16  sob when he was placed in this position.  The American Academy of Pediatrics
17  recommends that in order to reduce the risk of Sudden Infant Death Syndrome
18  (SIDS), infants should be placed for sleep in a supine position (wholly on the back)
19  for every sleep.

20      54.    On personal knowledge, Plaintiff Sanchez consulted with numerous
21  physicians regarding AS's condition.  Initially, he was diagnosed with eczema and
22  prescribed topical ointments.  However, the condition worsened, eventually resulting
23  in sores forming on AS's back when he was almost seven months old.  The sores
24  were filled with pus and would eventually burst, causing open sores that would scab
25  over.  Ms. Sanchez then consulted with a pediatric dermatologist who diagnosed AS
26  with herpes and prescribed him an unnecessary anti-viral medication.

27      55.    On personal knowledge, in October of 2008, when AS was ten-months
28  old, Plaintiff Sanchez ceased placing him in Carter's tag-less clothing.  Within a

15

1   week thereafter, AS's skin condition had improved.   After consultation with the
2   pediatric dermatologist, Ms. Sanchez placed AS in the tag-less clothing again.
3   Immediately thereafter, AS had another flare-up.

4       56.    On personal knowledge, in October and November of 2008, Plaintiff
5   Sanchez notified Carter's of her son's condition caused by the defective apparel.
6   During the same time period, Ms. Sanchez also filed a Consumer Product Incident
7   Report with the Consumer Product Safety Commission.   To the extent that Carter's
8   responded to Ms. Sanchez's notification, such response was insufficient.

9       57.    On personal knowledge, the treatment for the condition has included
10  the purchase and use of various lotions, prescription topical ointments and anti-viral
11  medication that Ms. Sanchez would not had purchased otherwise had AS not been
12  suffering from the severe skin irritation caused by the defective apparel.   She was
13  not aware of the presence of the toxic chemicals in these clothes, and if she had been
14  told of these material facts or that they might have been the likely cause of AS's
15  discomfort, she would never have purchased such clothing.

16  **3.    Kina Abrams**

17      58.    On personal knowledge, between 2007 and 2008 Plaintiff Abrams
18  purchased numerous pieces of Carter's brand tag-less garments for her son "TA"
19  from Babies R Us, Toys R Us, Target and Kohl's.

20      59.    On personal knowledge, Ms. Abrams first noticed her son's condition
21  on his back at his two week doctor's appointment.   This is the exact area where the
22  Carter's tag-less label came into contact with his skin.

23      60.    On personal knowledge, TA's condition eventually spread over his
24  body to include his face.   By six months, the condition had worsened to such an
25  extent that Ms. Abrams did not take baby pictures or videos.   (*See* Exhibit C to
26  Plaintiffs' Third Amended Complaint).

27      61.    On personal knowledge, Ms. Abrams eventually stopped putting TA in
28  the defective apparel.   Within two weeks, the condition had cleared up.

16

62.     On personal knowledge, the treatment for the condition included the purchase and use of various lotions, as well as physician consultations with allergy specialists that Ms. Abrams would not had purchased or attended had TA not been suffering from the severe skin irritation caused by the defective apparel.

63.     On personal knowledge, Ms. Abrams contacted Carter's to notify them of TA's condition and to inquire if this could be the cause of his skin issues, but was not provided an adequate response.

64.     On personal knowledge, the treatment for the condition has included the purchase and use of various lotions and prescription topical ointments that Ms. Abrams would not had purchased otherwise had TA not been suffering from the severe skin irritation caused by the defective apparel.  She was not aware of the presence of the toxic chemicals in these clothes, and if she had been told of these material facts or that they might have been the likely cause of TA's discomfort, she would never have purchased such clothing.

**4.     Anastasia Booth**

65.     On personal knowledge, between 2007 and 2008, Plaintiff Booth purchased hundreds of pieces of Carter's brand tag-less garments for her daughter "MB" directly from a Carter's retail store located in Arundel Mills shopping mall in Hanover, Maryland.

66.     On personal knowledge, Carter's clothing made up ninety percent of MB's wardrobe.

67.     On personal knowledge, when she was approximately six to eight weeks old, MB began suffering from a sore located between her shoulder blades on her upper back/lower neck.  This is the exact area where the Carter's tag-less label came into contact with her skin.   (Exhibit D to Plaintiffs' Third Amended Complaint).

/ / /

/ / /

17

68.   On personal knowledge, over the next four months, the condition worsened, eventually spreading across MB's back and resulting in the formation of pus-filled blisters.

69.   On personal knowledge, Plaintiff Booth consulted with her daughter's pediatrician regarding MB's condition that was initially diagnosed as eczema.  The treatment included the purchase of over-the-counter and prescription topical ointments that Ms. Booth would not had purchased had MB not been suffering from the severe skin condition caused by the defective apparel.

70.   On personal knowledge, Ms. Booth became aware of the defective apparel as a result of an October, 2008 announcement from the Consumer Product Safety Commission regarding Carter's Fall 2007 line.

71.   On personal knowledge, Ms. Booth contacted Carter's via telephone to notify them of MB's condition.  Ms. Booth also took large bags of MB's clothing from the Fall 2007 line to a Carter's store in Hanover, Maryland where she spoke with the store manager.  However, the store manager was not aware of the problems associated with the defective apparel or the Consumer Product Safety Commission announcement and informed Ms. Booth she would contact the corporate office.  A few days later, the store manager informed Ms. Booth that she could not return to the clothes to the store, but she could obtain more information from the Carter's website.

72.   On personal knowledge, Ms. Booth ceased using the defective apparel from the Fall 2007 line at the time she learned about the Consumer Product Safety Commission announcement and, as a result, saw an improvement in her daughter's condition.

73.   On December 24, 2008, Ms. Booth placed her child in a piece of the defective apparel from the 2008 Carter's product line that was not referenced in the Consumer Product Safety Commission announcement or Carter's website.  However, just as with the defective apparel from the Fall 2007 line, MB suffered an adverse reaction to this Carter's tag-less product as well.

18

**5.   Amy Muir**

74.   On personal knowledge, Plaintiff Amy Muir is an individual and resident of Long Beach, California.

75.   Starting in March 2008 through June 2008, Ms. Amy Muir used Carter's baby apparel on her infant son, Cooper, including tag-less shirts, one-piece outfits, polo pieces, and pajamas.

76.   Ms. Amy Muir purchased these items from a Carter' store located near her home, and also received several of these items from her mother-in-law, who also purchased them from a Carter's apparel store.   As described herein, the Carter's tag-less clothes injured her child's skin - products Defendants either directly or indirectly designated, manufactured, marketed, distributed, labeled, promoted and/or sold.

**6.   Nancy Muir**

77.   On personal knowledge, Plaintiff Nancy Muir is an individual and resident of Winnetka, California.

78.   From January through August 2008, Ms. Nancy Muir purchased Carter's infant apparel from a Carter' store located approximately two miles from her home.

79.   The Carter's infant clothes Ms. Nancy Muir purchased had tag-less labels, which injured her infant grandson, and which products Defendants either directly indirectly designed, manufactured, marketed, distributed, labeled, promoted and sold.

**C.   Carter's Notice of the Apparel's Defective Nature, and Its Inadequate and Misleading Response to Complaints**

**1.   Defendant's knowledge that the Defective Apparel Contained DEHP and Formaldehyde**

80.   Clothing in Carter's Fall 2007 line was shipped from Asian factories and distributed to retail stores between May and September 2007.   The Fall

///

19

1  2007 line was largely sold by October 2008, when Carter's finally addressed the

2  tag-less issue on its website.

3      81.    Carter's knew by 2006 that the tag-less labels used in the Fall 2007

4  line contained phthalates at levels exceeding the maximum permitted by Carter's

5  quality standards – 0.1% of total weight.  This standard was set out in a tag-less

6  label manual created by Carter's to give vendors the specifications and standards

7  required by the Company.  Carter's manufacturers were required to sign a sheet

8  indicating receipt of such manuals, which stated explicitly that clothing not meeting

9  the standards therein would not be approved for shipment.

10     82.    By 2006, Carter's required that tag-less labels contain no more than

11 0.1% of DEHP and certain other phthalates and clearly set out that standard in

12 written correspondence with vendors.

13     83.    Consistent with Carter's policy, Avery does not recommend use of

14 labels with phthalates for children under 36 months.

15     84.    In fact, Avery Dennison provided Carter's written confirmation during

16 2006 that the phthalate content of the tag-less labels it produced far exceeded

17 Carter's mandatory 0.1% threshold.

18     85.    Carter's 0.1% limit reflected the standard adopted by the European

19 Union in 2005, adopted by San Francisco in 2006, and adopted by the United States

20 in February 2009.

21     86.    Avery Dennison has admitted providing Carter's test reports prior to

22 July 2007, showing that the tag-less labels it produced for the Fall 2007 Line

23 contained the phthalate DEHP.

24     87.    Carter's also received, in February 2007, a letter from Inter-Trend

25 enclosing a test report showing that Inter-Trend's tag-less label exceeded the 0.1%

26 permissible threshold for DEHP.  The Inter-Trend test report was prominently

27 marked with the word "FAIL" in large block letters.  Carter's representatives have

28 ///

20

1  not disputed the fact that Carter's received the Inter-Trend test report in February,
2  2007, before any clothing in the Fall 2007 line was shipped to consumers.

3       88.    Pacific Concept has not provided information in response to Plaintiffs'
4  subpoena seeking similar records but documents obtained in discovery establish
5  that Carter's put Pacific Concept on notice of the injury reports relating to the tag-
6  less labels and that Pacific Concept independently tested its labels, which have like
7  Avery Dennison and Inter-Trend labels been associated with skin irritation.

8       89.    Despite the clear evidence that the tag-less labels it placed on clothing
9  in its Fall 2007 line contained DEHP and other phthalates far in excess of Carter's
10 own standard, Carter's distributed that line of clothing throughout the United
11 States.

12      90.    Based on test reports Carter's received from tests conducted on tag-
13 less labels used with the Fall 2007 line, Carter's was also aware by 2006 that the
14 tag-less labels of the sort used in the Fall 2007 line contained formaldehyde.

15   **2.   Carter's Receipt of Numerous, Unprecedented Reports of**
16   **Injuries to Infants and Children**

17      91.    On November 2, 2007, while Carter's Fall 2007 line was still on store
18 shelves, Carter's received a complaint from a consumer who stated that her child
19 had suffered a chemical burn in the area where the tag-less label on an item of
20 Carter's clothing had contacted the child's skin.   As recounted in records
21 maintained at Carter's call center, the customer told Carter's that the child broke
22 out "in a terrible rash on his back in the exact shape of the tag."

23      92.    This complaint was followed in quick succession by additional
24 complaints, in which people who had bought Carter's garments reported severe skin
25 burns and rashes caused by the tag-less labels on those garments.

26      93.    On November 6, 2007, for instance, a customer informed Carter's that
27 she "wanted to let us know about a rash her grandson was getting from our tag-less
28 bodysuits.  It is in the exact shape of the tag." On November 14, another customer

reported that "it looks like the skin is burned at it is the same size as the tag-less decal."  On November 19, 2007, another customer reported that a child "was getting a rash on her back from the tag-less tag and it looked like her skin was melted."

94.     These reports are just early examples of what to date have amounted to over three thousand, four hundred customer complaints about the tag-less labels, which Carter's received steadily, month by month, during 2008 and 2009.

95.     Throughout that period, customers continued to report that their children had suffered after wearing tag-less labels.  To take another example, on January 14, 2008, a customer reported "[i]ts actually more than a rash.  Whatever substance the 'tag' is printed in has irritated him to the point that his skin is broken and oozing.  My physician is concerned [that] he's at risk for developing an infection."

96.     Prior to the distribution and sale of its Fall 2007 Line, Carter's had never received a complaint about a tag-less label.

97.     Carter's recognized the serious nature of the reports immediately and commenced an investigation, led by its Vice President for Quality, Jim Eidson, that month after receipt of the third complaint.

98.     Eidson's investigation was the focus of top management at Carter's.  At the very outset of the investigation, in fact, he was called into a meeting with Carter's Chief Executive Officer, President, Legal Counsel and other top management to address the complaints about the tag-less labels.  Eidson subsequently had multiple meetings and calls with Carter's Chief Executive Officer and its Senior Vice President to discuss the continuing stream of complaints flowing in regarding children injured by the tag-less labels and Carter's response to those complaints.

99.     While discussing the problems associated with the tag-less labels at the highest levels in November and December 2007, Carter's management did not at

22

that time take any steps to warn the public about the injuries reported by its customers. Carter's Fall-2007 line would remain on store shelves for many more months, during which the public had no warning of the problems associated with the tag-less labels.

100. Although Carter's had obtained garments in November from customers who had reported rashes and burns, it did not send them to an independent lab for testing. Rather, Eidson sent the clothes to Avery Dennison, the primary supplier of tag-less labels with a contract for the sale of millions of labels to Carter's, and asked Avery to review the clothing to determine the cause of the reported burns and rashes.

101. Between December 2007 and January 2008, Carter's notified its other label manufacturers, Pacific Concept and Inter-Trend, of the growing problem with Carter's tag-less apparel.

### 3. Early Independent Tests Showing that the Chemicals in the Tag-less Labels Were Skin Irritants and Defendants' Failure to Disclose Those Test Reports

102. Avery Dennison considered two alternatives for testing. The first, chemical testing, would involve evaluating the chemicals in the clothing. The second, biological testing, would involve applying the label substance to cells in a laboratory to determine whether they killed cells at high numbers in excess of international standards for skin irritation. As both tests would involve destruction of samples, a choice had to be made for a given sample.

103. In November, 2007, Carter's asked its main label supplier, Avery, to test labels on two items of clothing. Avery directed North America Science Associates, Inc. ("NAMSA") to test tag-less labels on returned clothing to determine whether they met the International Organization for Standardization's ("ISO") standard for cytotoxicity – that is, toxicity to cells.

104. NAMSA provided the test results in response to a subpoena by Plaintiffs; they show that testing conducted in early December, 2007, while the Fall

23

1 2007 Line was still being sold to consumers, confirmed that the tested tag-less
2 labels failed ISO standards for cell toxicity – the standard that Defendants
3 themselves selected as the proper measure for determining whether the labels were
4 skin irritants.

5   105.   Avery has produced NAMSA reports in discovery but appears not to
6 have provided the report establishing that tag-less labels on Carter's Fall 2007 line
7 failed ISO standards.  Nor has Avery provided any explanation for the failed test.

8   106.   Mr. Eidson, in deposition testimony, authenticated the NAMSA report,
9 but, after a lengthy private, off-the -record discussion with counsel, recanted that
10 testimony and testified that he had only seen the different version later provided by
11 Avery.  In other words, Mr. Eidson claimed he had never seen the test that showed
12 that the tag-less labels failed international standards for cell toxicity.

13 **4.    Defendants' Failure to Retain Experts or Otherwise Take Steps**
   **To Investigate the Injuries Caused by Tag-less Labels**
14

15   107.   Carter's never made any effort to discuss any findings in the NAMSA
16 study with the testing lab itself.  It confined its discussions to Avery.

17   108.   Carter's never retained a toxicologist, a chemist, or a physician or
18 other health professional to independently evaluate the tag-less labels.  At least until
19 Carter's retained counsel and a public relations firm in late 2008 after the Consumer
20 Product Safety Commission ordered it to reveal the dangers associated with tag-less
21 labels, Carter's never sought to test another garment other than the two or three it
22 provided to Avery.

23   109.   Carter's received a steady stream of clothes from consumers whose
24 children had suffered rashes and burns from tag-less labels, yet tested none of those
25 clothes to determine the cause of such problems.

26   110.   During the period in late 2007, Avery also retained Intertek, another
27 testing company, to review the toxicological effects of the chemicals in the tag-less
28 labels.   Avery provided the list of chemicals to consider, but omitted both

24

formaldehyde and DEHP – the chemicals that Plaintiffs' own testing found in the tag-less labels.

### 5.   Defendants' Failure to Investigate the Ink Used in Tag-less Labels Which was Associated With "Irritations, Defatting and Dermatitis"

111.   During this same period, Avery and Carter's discussed obtaining an analysis of the ink used in the tag-less labels applied to the Fall 2007 line. Carter's and Avery entered into negotiations to create a confidentiality agreement which would permit Avery to obtain and share the ingredients of the ink, which are proprietary and maintained by Subli Impressos, a Mexico-based ink manufacturer.

112.   The confidentiality agreement was never finalized. Jim Eidson in Deposition testimony, stated that the negotiations over the agreement had been managed by his supervisor and upper management and that he did not know why Carter's and Avery had never entered into the agreement necessary to permit disclosure of chemicals in the tag-less label ink.

113.   The Material Safety Data Sheet for the Subli Ink, which Carter's claims never to have received, states that the ink "may cause irritation, defatting or dermatitis."

114.   Eidson, Carter's Vice President of Quality, attempted in deposition testimony to minimize the significance of the Material Safety Data Sheet by noting that it addressed ink as used at the workplace. However, he conceded that as part of his investigation he himself had looked to Material Safety Data Sheets for other inks to evaluate the cause of the problems caused by Carter's tag-less labels.

115.   Avery did have access to the Subli Material Safety Data Sheet in 2007 and 2008.

### 6.   Carter's Rejection of its Own Employees' Request to Warn The Public About the Defective Apparel

116.   After months of complaints of  "severe", "oozing", "terrible" burns caused by tag-less labels, Janell Cleveland, Carter's Senior Director of Consumer

Affairs, who supervised the call center receiving the complaints, went to Eidson and Brendon Gibbons, Carter's General Counsel, and urged them to issue a public statement warning the public about the dangers linked to the tag-less labels. Both executives refused, directing her to not issue a public statement. Ms. Cleveland, in deposition testimony, would not precisely identify the dates of these conversations but indicated that they had occurred in the Spring of 2008, months before Carter's first went public with such information at the direction of federal authorities.

### 7.   Defendants' Refusal to Inform the Public Until Ordered by Federal Authorities

117.   During this same period, Avery Dennison was in possession of the NAMSA test report showing that its labels were a skin irritant, and made aware by Carter's of the customer complaints associated with the tag-less labels. Avery Dennison, like Carter's, made no effort to notify federal or state officials or the public of the injuries associated with those labels, the failed NAMSA test report, or the fact that the phthalate levels in the tag-less labels far exceeded Carter's standards.

118.   During this same period, Inter-Trend was aware that its tag-less labels failed Carter's standards for DEHP and was aware of customer complaints about burns caused by tag-less labels it manufactured. Inter-Trend made no effort to notify federal or state officials or the public of the injuries associated with those labels, the "FAIL" test report it sent Carter's in February, 2007, or the presence of DEHP at levels in excess of Carter's standards.

119.   During the Spring of 2008, internal Carter's emails indicated that Carter's executives were focused on the fact that the Fall 2007 line was still in inventory and on store shelves. Their expectation was that the defective clothing would be largely sold by Fall 2008.

120.   In the eleven-month period starting November 2, 2007, during which Carter's concealed the defective nature of its Fall 2007 line from the public,

26

Carter's never contacted a parent of any injured child to obtain medical records or other information about the injuries associated with the tag-less labels.

121. Other than the handful of tests conducted by its supplier, Avery, Carter's, during that period, never tested any of the thousands of garments returned by consumers to determine the chemical make-up of the tag-less labels, or to determine whether biological analysis would reveal the presence of skin irritants.

122. In October, 2008, the Consumer Product Safety Commission, having received numerous complaints directly from injured consumers, ordered Carter's to issue a public statement to inform the public about the dangers linked to the tag-less labels.

123. Just prior to that statement, in September 2008, Carter's placed a general advisory about tag-less labels in the Q&A section of its website.  At the time it put out this first public statement about the injuries associated with tag-less labels, Carter's was already in discussions with the Consumer Product Safety Commission and aware that it had no choice but to go public.

**8.    Carter's Effort to Conceal and Minimize Defects in the Apparel Through False and Misleading Public Statements**

124. In preparation for its public announcement of the tag-less label injuries, Carter's retained a public relations firm, The Edelman Group, and attorneys to assist with its public statements about injuries associated with the tag-less labels.

125. Carter's public statements were carefully crafted to mislead the public about the dangers associated with the tag-less labels, and contained many outright falsehoods.

126. For example, Carter's told the public that the tag-less labels came from "U.S. based suppliers" – a statement what was patently untrue.  Inter-Trend is not U.S.-based.  Moreover, none of the tag-less labels were produced in the United States.

Third Amended Class Action Complaint                    Case No. 2:08-CV-07367-GAF (MANx)

127.   Carter's told the public that the labels in question were "phthalate free" – a statement, as Carter's knew from its own test reports and discussions with Avery Dennison, was patently false.

128.   Carter's told the public that the tag-less labels "never contained Formaldehyde."   Again, Carter's had test reports establishing that this statement was false when made.

129.   Carter's told the public repeatedly that it had contacted "several independent experts," "including doctors," and specifically "dermatologists" to evaluate the health problems associated with tag-less labels.   These statements were false.   Carter's retained no independent experts, at least through Fall 2008.   Carter's also retained no dermatologists or other physicians to actually conduct a review of the tag-less label issue.   Carter's sole involvement of any doctor was a discussion between Senior Vice President Charlie Wetzel and his personal dermatologist. Carter's never retained any expert of any kind to independently evaluate the tag-less labels and advise company officials about the chemical make-up or toxicity of the chemicals.

130.   Janell Cleveland drafted all of Carter's notices and then submitted them to a group of individuals, including Carter's General Counsel, Vice President for Quality, The Edelman Group public relations firm and outside counsel, to review before publication.   No independent scientific experts were ever included to actually evaluate the accuracy of the statements.

131.   Statements in Carter's public notices, even when not patently false, were carefully crafted to mislead the public.   To take just one example, Carter's, in October 2008, stated that it had received "several" complaints about the tag-less labels, when in fact it had received hundreds of such complaints and that Carter's had recognized after just a handful of such complaints that they were evidence of a serious and dangerous flaw in the tag-less lablels on the Fall, 2007 line.   Similarly, Carter's repeatedly assured the public that labels met "safety standards" without

28

noting that it was fully aware that the labels failed Carter's own longstanding safety standards.

132.   Even after it was forced to go public with the news that its Fall 2007 line was defective and that tag-less labels on that line were associated with severe skin reactions in infants and young children, Carter's avoided disseminating that information through the channels it had in place for communicating with consumers.

133.   Carter's maintains a database of over 600,000 persons who have bought Carter's clothing and uses that database to send out coupons and other mailings.   Carter's never sent any information about the tag-less label issue to its customers using this ready-made means of communication.

134.   Nor did Carter's use any media, press release, direct mail or other means to contact the public.   After being forced to do so by federal officials, it placed a message on the Internet and responded as necessary to press inquiries.

135.   Carter's does not track "hits" to its Internet site and has no knowledge how many members of the public have accessed its messages at that site.

136.   Defendants were all aware by 2006 that tag-less labels could be produced without phthalates or formaldehyde.   Such labels are more expensive than the labels Carter's elected to use for its Fall 2007 line.   Carter's and Avery have now switched to using and manufacturing, respectively, the phthalate free labels.

137.   Many consumers, including Plaintiffs, who have clothed their babies in the defective apparel, have seen their children suffer severe skin damage in the area where the tag-less label contacts the skin.

138.   Carter's represents its products are subject to "extensive third-party testing." If done, such testing either revealed the presence of hazardous chemicals in the tag-less labels or was conducted with reckless disregard for that information. Such testing gave, or in the absence of reckless disregard for the truth should have

/ / /

29

provided, Defendants with notice of the existence of hazardous chemicals in the tag-less labels prior to the distribution of clothing with said labels.

139.   Many affected parents have posted their experiences with the defective apparel on various internet websites.   Here is a sample of postings beginning in March of 2008 on the Green Living Q&A website (http://www.dld123.com/q&a/index.php?cid=5762) that discuss the defective apparel and Carter's response (emphasis added):

> **I am so relieved to hear other people having the same problems with tagless clothes**! My son started having severe reactions to his tagless clothes at 4 months of age (he is now 6 months).  His back will turn very red and start oozing right where the "stamp" is in the back of his clothes . . . the rash will appear as the exact size and shape of the stamp.  The redness will then spread out from there. I have seen a number of pediatricians who confirmed it is an allergic reaction, we just don't know what material in the stamp is causing the reaction.  **My son has the most severe reaction to the Carter's brand tagless clothing.** I have searched online and seen pictures of other babies with this reaction, and those pictures look like the same reaction my son had.  I urge everyone who has experienced this to take pictures and send them to the clothing companies. There is obviously something very irritating about the tagless clothing, and I think the clothing companies should certainly do something about this!
>
> POSTED BY KCW :: TEXAS USA :: 03/09/2008 6:58 PM

30

What a relief to know that I am not crazy... My son is 5.5 months old and has been reacting horribly to the screen-printed "tag" in the back of his clothing for the past few weeks. (interesting that another mom said her son started to react around 4 months also!)  **We've seen the worst reaction to Carter's clothing, most definitely. I recently emailed Carter's to ask for more information but have not heard back**.  Now we are having a heck of time finding clothes with plain ol' tear-em-out tags for him to wear. Everything has this screen-print in it. Thank you for sharing your thoughts!

POSTED BY MMW :: TEXAS USA :: 04/07/2008 1:09 PM

(This is a follow-up to a previous post I made on this site.)  I received a reply from Carter's Clothing not long after I originally contacted them. They sent me self-addressed stamped envelopes to return ALL of our Carter's clothing due to my son's horrible reaction to the screen-print.  They refunded me for each item, new and used, and said that they were being passed along to Quality Control.  **I have yet to receive a report on what those folks found but at least it has been called to their attention**. We only have one Gerber's onesie with the tagprint and my son reacts to it as well. Good for you Moms who contacted them!  A tip for 'tagged' clothing... Koala Kids (Babies R Us sells the brand) puts tags in all of their clothes and they are easy to cut out, no

31

screenprint.  We are only putting our son in their clothes now and have seen zero reaction in the last two months.

POSTED BY MMW :: TEXAS USA :: 05/26/2008 1:17 PM

Follow up to my previous post. I was able to talk with a Customer Service representative at Carter's and they have asked that I send back all the clothes causing the irritation, which is all of them.  **They would not tell me what the ink consist of.**  However, they will test my clothing and send me a voucher for new clothes....of which I won't use because I have eliminated all tagless clothing from my son's wardrobe. I have also instructed friends and family to only buy him clothes with the good old fashion tags in it.  **The rep. said that with the Spring line Carter's has a new tagless stamp that should stop this from happening**.  I don't think I will be testing it out. I don't want to put my son in anymore discomfort.  I have also sent an e-mail to Target because their Circo clothing line breaks him out as well.  I have not heard back from them to date.

POSTED BY STARR :: GA USA :: 06/02/2008 2:31 PM

Okay, it is 2 A.M.!  I googled - baby with swollen rash on back because **my poor 2 month old baby went to sleep with a bad rash!  The same one everyone else is talking about!!!!  But the crazy thing is, is that she wore a pink Carter's onezie today.**  Daaaaaang, this is crazy!  It

32

really is Carter's.  I noticed that someone else said Gerber onezies do the same.  That's going in the same pile as the Carter's toxic onezies!  Man, we need to start a class action lawsuit!  Seeing my baby like this is too much stress....I bet there's thousands like us.

POSTED BY LDOYLE :: CALIFORNIA USA :: 06/03/2008 8:16 AM

**Hey everyone! I just reported my issues w/ Carter's and Gerber's tagless tags to the US Consumer Product Safety Commission 1-800-638-2772** or file a report online too.  It would be great if everyone reported their own incidents to the Commission so that these companies have more pressure to use safer, nontoxic materials on our babies.  If your babies had the same itchy, red and raw rash my baby suffered for months then you would do it.  I mean **I had to give her Benadryl and Hydrocortisone cream (neither are good for babies) when it got really bad AND had to pay for a doctor's visit all b/c of these products!**

POSTED BY ALLIE :: MINNESOTA USA :: 06/05/2008 11:30 PM

**I just called Carter's to let them know my daughter was breaking out in a bad rash whenever she wore their clothes and the woman on the phone said she had a few calls with the same situation.  She said they were coming primarily from their last season of clothes that**

33

have a big white box on the tagless tag. **She said their new line is a different tag and hopefully is better.** She asked that I send all my clothes back so they can investigate to find the cause of the problem and they would reimburse me for what I bought. I think it is important that whoever is having this problem send their clothes back so they can get to the root of the problem to fix it for the future. She did mention that the tag does not contain latex so that is good to know. I hope this helps! POSTED BY EL :: CALIFORNIA USA :: 06/29/2008 2:49 PM

**My 11 month old daughter has the same nasty rash on her back from wearing Carter's tagless clothing.** It started at around 4 months. At first our pediatrician said to use Aquaphor on it which is fine or at least it was at first...since then we've had to use a prescription antibiotic on it. It's amazing to me that someone tried to create "tagless" clothing because they believed that tags caused discomfort, but now it's the tagless clothing that is the problem. I'll stick to itchy tags and cut them out. POSTED BY KN :: VIRGINIA USA :: 07/08/2008 3:12 PM

Hi, Thank you all for your comments. **I'm relieved that my daughter isn't the only one with this issue. I was getting worried that it was her sensitive skin. She has the reaction to the Carter's clothing. It started when**

34

**she was about 5 months old, the raw skin and oozing.**
I covered it with a large athletic bandage at night and during the day had her shirtless when I could.  It went away and came back this weekend.  I just emailed Carter's to find out what type of material the tag was made from.  I'll also take your advice to send back the clothing for my money back.  All of her onesies, sleepwear and day clothes are Carter's.  Thanks for your advice and I look forward to seeing how Carter's will rectify their new clothing line next season.

POSTED BY LAWANA :: NEW JERSEY USA :: 07/08/2008 4:22 PM

140.   These comments and representations are representative of multiple similar entries on many websites during the same period.   *See   e.g.* http://blogs.babiesonline.com/products/tagless-tops-giving-babies-rashes/.

141.   According to an article posted on the website ZRecommends, http://www.zrecommends.com/detail/carters-on-the-record-an-interview-with-michael-casey-carters-ceo/, Janell Cleveland, Carter's Senior Director of Consumer Affairs, stated Carter's began receiving complaints about its defective apparel in November of 2007.   (Exhibit F to Plaintiffs' Third Amended Complaint).   Yet despite these complaints, Carter's and Avery Dennison made no formal disclosures about the presence of toxic chemicals and if they might be the source of skin irritation for a year.

142.   In the same interview, Ms. Cleveland is also quoted as saying (emphasis added):

[i]ndependent testing of the labels conducted by Carter's confirmed that the standard labels did not exceed any

35

ASTM limits for Azo dyes, heavy metals, or lead, and had

**'never contained formaldehyde.'**

Contrary to Ms. Cleveland's representations, the defective apparel did, in fact, contain formaldehyde.

143. On October 24, 2008, almost one year after Carter's reportedly began receiving complaints regarding its defective apparel, the U.S. Consumer Product Safety Commission (CPSC) and Carter's issued the following advisory:

> The U.S. Consumer Product Safety Commission (CPSC) and Carter's, Inc., of Atlanta, Georgia, are advising parents and caregivers that they have received reports that a small percentage of babies and infants have developed rashes on the upper back after wearing Carter's clothing with heat-transferred, or "tag-less," labels.
>
> This advisory applies to Carter's Fall 2007 product line. The Fall 2007 line utilizes a label on the inside back of the garment that has a raised surface with a solid, rather than a stenciled, background. This advisory does not apply to previous and current product lines, which utilize labels with stenciled backgrounds.
>
> The garments, which were made in various countries, were sold at Carter's own retail stores and at department and national chain stores.
>
> If your child develops a rash on the upper back after wearing garments that have a "tag-less" label with a solid background, you should stop using these garments. If the

36

rash persists or worsens, you should contact your pediatrician. For additional information, visit Carter's website at http://www.carters.com/corporate/tagless_message.aspx, contact Carter's toll free at 1-888-282-4674 or by email at contactus@carters.com.

144.   Carter's also responded by instituting a private recall for the defective apparel, but only if Class members manage to learn of the recall and manage to run the gauntlet of unreasonable conditions Carter's has imposed before providing such potentially limited and inadequate relief.

145.   Carter's has admitted it believes it has undertaken a duty to ensure its apparel products are safe and thereby free from harmful substances that can injure infants and young children.   For example, in a November, 2008 e-mail from Ms. Cleveland, Senior Director of Consumer Affairs for Carter's, Inc., answering KCTV5 News reporter Eric Chaloux's questions about the skin condition after the CPSC announcement, Cleveland stated (emphasis added): "[e]veryone at Carter's is taking this issue very seriously and working hard to solve it.   Carter's is a family oriented business.   **Our focus is taking care of babies and young children. Children's safety and comfort are our top priorities.**

146.   Subsequent to the CPSC announcement, Carter's posted a "Message From Carter's on Tagless Labels" on its website.   (Exhibit E to Plaintiffs Third Amended Complaint).   In the announcement, Carter's recognizes it has received "reports that some infants with sensitive skin could be allergic to heat-transferred, or 'tagless,' labels used in baby and infant clothing, including Carter's clothing."

147.   Consistent with its overall marketing efforts, Carter's used the announcement to remind its customers that it is supposedly "committed to being the industry leader in product safety and quality,""[a]ll of our products must pass

37

1 rigorous third-party testing to ensure they meet the highest safety and quality
2 standards and are compliant with all laws and regulations," and "[w]e take pride
3 in knowing that parents rely on us to provide trusted products that help make their
4 lives simpler." (emphasis added).

5     148.   The     announcement     also     made     the     following     specific
6 misrepresentations regarding the defective clothing known to have contained
7 hazardous chemicals such as DEHP and formaldehyde: (a) "Our review and testing
8 provide no indication that the labels contain any known skin irritants or abrasive
9 chemicals, or that such a rash is anything beyond a rare allergic reaction to an
10 otherwise safe product;" (b) "[T]he reaction is a type of allergic reaction called
11 contact dermatitis and that it generally clears up completely within a matter of days
12 after removal from contact with the allergen;" (c) "We have been assured by our
13 label manufacturers and other experts that these labels contain no abrasive chemicals
14 or irritants;" and (d) "The various testing that we perform on all our garments allows
15 us to check for known irritants, toxins and other substances that are banned from
16 children's clothing."

17     149.   These statements were untrue when made and reflect an effort to
18 actively conceal the hazardous chemicals in the tagless labels.  Independent tests
19 have established that the tagless labels in question contain DEHP and formaldehyde,
20 chemicals identified by state and federal health agencies to be known to cause
21 dermatitis and other skin diseases, and are also linked to severe long term health
22 disorders including cancer. *See infra* ¶¶ 86-116.

23     150.   In an interview done after the CPSC announcement, Carter's CEO
24 Michael Casey had the following comment regarding the defective apparel that
25 contained harmful chemicals such as formaldehyde and DEHP: "There was nothing
26 in that label we could identify that could cause that kind of reaction which led us to
27 conclude that this is a rare allergic reaction in some babies with highly sensitive
28 skin." (Exhibit F to Plaintiffs' Third Amended Complaint).

<div align="center">38</div>

151.   Mr. Casey's statement was untrue when made, and contradicted by independent tests showing that the tag-less labels in question contained DEHP and formaldehyde.

152.   Yet at the same time, Mr. Casey stated that by the time of the CPSC press release, Carter's had had been contacted by approximately 400 consumers about the issue, and the total number of contacts was "roughly 800 consumers regarding the issue."

153.   In downplaying the affected children's condition, Mr. Casey opined they were merely suffering from contact dermatitis.

154.   According to the American Academy of Allergy, Asthma & Immunology (http://www.aaaai.org/patients/gallery/skinallergies.asp?item=1b), contact dermatitis refers to

> [A] broad range of reactions resulting from the direct contact of an allergen or irritant with the surface of the skin.  A reaction usually appears after one to three days.  The skin becomes red, itchy and inflamed, and will frequently blister.  Poison ivy is the most common cause, but other plants, metals (such as nickel), cosmetics and medications can also cause a reaction.

> Allergic contact dermatitis can be treated by scrubbing the skin with soap and water after exposure to the allergen and using prescribed antihistamine and cortisone medications, depending on severity.  Avoidance of the irritant is the most effective prevention.

155.   Despite Mr. Casey's belief that the affected children were suffering from a condition where avoidance of the irritant is the most effective prevention,

39

1 Carter's has sought to remedy the problem by instituting an ineffective silent recall.

2 Defendants have provided no reasonable comprehensive notice to consumers or

3 pediatricians advising them of the presence of these chemicals in the defective

4 products, which products contain such chemicals, if they no longer contain these

5 chemicals, the levels of exposure to such chemicals, to stop using these products if a

6 rash occurs or other material information.

7 156. Mr. Casey's apparently unconcerned opinion regarding contact

8 dermatitis is undermined by the Mayo Clinic's finding that:

> Prolonged itching and scratching may increase the intensity of the itch, possibly leading to neurodermatitis (lichen simplex chronicus). Neurodermatitis is a condition in which an area of skin that's frequently scratched becomes thick and leathery. The patches can be raw, red or darker than the rest of your skin. Persistent scratching can also lead to a bacterial skin infection and permanent scars or changes in skin color.

17 *See* http://www.mayoclinic.com/health/contact-dermatitis/DS00985

18 157. According to the American Academy of Allergy, Asthma &

19 Immunology, contact dermatitis leads to approximately 5.7 million doctor visits each

20 year. Thus, Mr. Casey's alleged diagnosis of contact dermatitis further establishes

21 the misleading nature of the statement on Carter's website that the rash is "a rare

22 allergic reaction to an otherwise safe product."

23 **D.    Children Are More Susceptible To Chemical Toxicity Than Are Adults**

24 158. The fact that children are more susceptible to chemical toxicity than

25 adults is widely recognized.

26 159. The National Academy of Sciences published a report in 1993 titled

27 "Pesticides in the Diets of Infants and Children" ("NAS Report"). NAS explained

28 that children are not little adults with respect to potential chemical toxicities:

40

> "A fundamental maxim of pediatric medicine is that children are not
> 'little adults.' **Profound differences exist between children and
> adults.** Infants and children are growing and developing. Their
> metabolic rates are more rapid than those of adults. There are
> differences in their ability to activate, detoxify, and excrete xenobiotic
> compounds. All these differences can affect the toxicity of pesticides
> in infants and children, and for these reasons the toxicity of pesticides
> is frequently different in children and adults [....]"

(NAS Report, at 3-4) (emphasis added).

160. The Natural Resources Defense Council ("NRDC") issued a report in 1997 titled "Our Children At Risk; The 5 Worst Environmental Threats To Their Health." NRDC explained that children are relatively more susceptible to potential chemical toxicities:

> "Pound for pound, children breathe more air, drink more water, and
> consumer more food than adults. **This higher rate of intake means
> that children will receive higher doses of whatever contaminants
> are present** in the air, water, or food. In addition, **infants have a
> relatively greater surface area of skin than adults, thereby
> increasing their potential dermal absorption of certain
> compounds**.... A typical newborn weighs one-twentieth of the weight
> of an adult male, but the infant's surface area is one-eighth as great.
> Therefore, the total area of skin that could be exposed to a
> chemical...is two and a half times as great per unit of body weight in
> the infant as in the adult."

(NRDC Report, Ch. 2) (citing International Programme on Chemical Safety, Principles for Evaluating Health Risks From Chemicals During Infancy and Early Childhood: The Need for a Special Approach, Environmental Health Criteria 59, World Health Organization, 1986) (emphasis added).

41

1    161.  In 2000, researchers from the EPA's National Exposure Research
2  Laboratory and the Environmental and Occupational Health Sciences Institute
3  published a report entitled "Children's Exposure Assessment:  A Review of Factors
4  Influencing Children's Exposure, and the Data Available to Characterize and Assess
5  That Exposure."  The authors observe in part:

> Both Physiologic and behavioral characteristics influence children's
> exposures to environmental contaminants [....]
>
> ***Physiologic characteristics.***  These characteristics influence
> exposure by affecting a child's rate of contact with exposure media or
> by altering the exposure-uptake relationship that governs internal dose
> resulting from an exposure.  Children have a much larger surface area
> relative to body weight than do adults.  The surface-area-to-body-
> weight ratio for newborn infants is more than 2 times greater than that
> for adults [....]
>
> The absorbed dose – the amount of chemical that crosses a
> receptor's external boundaries – of an environmental contaminant
> probably is the relevant measure of exposure for the assessment of
> health risk.  Age-dependent barrier properties of the skin, respiratory
> tract lining, and gastrointestinal tract lining influence absorbed dose.
> The permeability of the skin, highest at birth, decreases in the first
> year such that the skin of a 1-year-old child is similar to that of an
> adult.  (citing Bearer CF, "How are children different from adults?"
> *environ Health Perspect* 103:7-12 (1995).  In addition, a layer of
> subcutaneous fat develops at approximately 2 – 3 months of age in
> infants and continues to exist through the early toddler period.  This
> layer of fat may act as a sink for lipophilic chemicals absorbed
> through the skin (citing Thompson H. Physical growth.  In: Manual of

42

Child Psychology (Carmichael L, ed). New York: John Wiley and Sons, 1946; 255-294).

(Cohen Hubal, *et al., Environ Health Perspect* 108:475-486, at 476 (2000)).

162.   The United States Environmental Protection Agency ("EPA") issued its "Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens," ("EPA Supplemental Guidance") in early 2005.   EPA recognized that toxicokinetic and toxicodynamic differences between children and adults are greatest during the first two years of life.   (EPA Supplemental Guidance, at 32) (citations omitted).

1. Later in 2005, the Intergovernmental Forum on Chemical Safety's ("IFCS") Children and Chemical Safety Working Group published a report titled "Chemical Safety and Children's Health; Protection the world's children from harmful chemical exposures:  a global guide to resources" ("2005 IFCS Report").   IFCS concluded that children are uniquely prone to harmful chemical exposures and their adverse health effects because:

2. "Children's **exposure begins at conception**, as chemicals in a pregnant woman's body cross the placenta and affect the embryo or fetus during critical periods of development.   Some chemicals also accumulate in breast milk, compromising (though not negating) the benefits of this important food for infants.

3. "Even after birth, children's **bodies remain immature**, with underdeveloped detoxification mechanisms to protect them from chemicals.

4. "Their **brains and other organ systems are constantly developing**, undergoing periods of particular sensitivity to damage or disruption.

5. "Compared with adults, children **breathe faster and eat and drink more** in proportion to their bodyweight, resulting in greater exposure to chemicals in air, food, and water.

43

6. "Children **spend more time outdoors**, and often play on the ground or the floor, where chemicals such as pesticides and heavy metals are present.  In addition, young children frequently **place their hands or other objects in their mouths**, making ingestion of chemicals more likely.

7. "Pregnant women and young children are often at higher risk of **inhaling or coming into contact with chemicals used indoors**, such as cleaning solutions, paints, cosmetics, and other household and consumer products.

8. "Children are **less aware of potential chemical risks around them,** and are therefore less likely to avoid harmful exposures."

9. (2005 IFCS Report, at 3) (emphasis in original) (footnote omitted).

163.   Environmental Working Group ("EWG"), a nonprofit environmental research organization whose organizational goals include to "protect the most vulnerable segments of the human population—children, babies, and infants in the womb—from health problems attributed to a wide array of toxic contaminants," also explains that babies are more susceptible to effects from chemical toxins than are adults (emphasis added):

"Consider the skin.  Studies confirm what any parent knows:  an infant's skin is soft and delicate (Fluhr 2000; Giusti 2001).  Infant skin is also considerably thinner than adult skin; in fact, the thickness of children's skin increases linearly with age, typically reaching a maximum at age 20 (Tan 1982).  The thin skin of a newborn may well be more permeable to specific chemicals than the skin of an adult. Compounding this fact, **the surface area of a child's skin relative to body weight is greater than adults, such that the potential dose of a chemical following dermal exposure is likely to be about 3 times greater in infants than in adults** (West 1981; Clewell 2002).

44

"Babies and children thus receive far greater exposures than adults to ingredients in personal care products slathered on their skin. Sensitivity to many chemicals in children's care products causes eczema (Katelaris 2006), and may produce more subtle damage later in life. Exposures to industrial chemicals may prime children for adult diseases (NAS 1993; EPA 2005), just as a few severe sunburns during childhood doubles the likelihood of developing malignant melanoma later in life (Oliveria 2006)."

http://www.cosmeticsdatabase.com/special/parentsguide/children.php?nothanks=1

164.   Based on this empirical data and the fact Defendants' conduct is directed at small children with a sensitivity and susceptibility to being exposed to harmful chemicals, Defendants needed to be particularly vigilant to ensure that the infant products in question did not contain any harmful chemicals that might have both short and long term impacts, even at potentially very small exposure levels.

**E.     The Defective Apparel is Hazardous to Children's Health**

165.   The defective apparel contains known hazardous chemicals and toxins including unsafe levels of formaldehyde and DEHP.  These are known skin irritants that are also listed on California's Proposition 65 list as chemicals known to the State to cause cancer and, with respect to DEHP, to also be a developmental toxin to males, and thus require certain disclosures.

As noted above, Defendants were aware before the production of the defective apparel that the tag-less labels on that apparel contained both DEHP and formaldehyde.  A test report provided to Avery and then provided by Avery to Carter's established in December, 2007, long before the sale of much of the Fall 2007 line to the public, that the tag-less labels produced by Avery failed international tests for cell toxicity and were thus a skin irritant.   At least Avery was further

aware that the ink used in the tag-less labels was linked to "irritation, defatting and dermatitis."

**1.   DEHP is Hazardous to Children's Health.**

166.   DEHP is a member of a ubiquitous family of chemicals called Phthalates.

167.   Phthalates are produced in the millions of tons annually that are a component of many products that consumers are exposed to.   They are used in the manufacture     of     plastics     and     are     often     called     plasticizers. http://www.cdc.gov/exposurereport/pdf/factsheet_phthalates.pdf   CDC reports that Phthalates are used as solvents for other materials and that they are used in products such as vinyl flooring, adhesives, detergents, lubricating oils, automotive plastics, plastic clothing, and personal care products.   (*Id.*)   At least one researcher reported that DEHP is also used in certain inks.   (Wormuth, Matthias, "Consumer exposure to chemical substances with diverse applications — Contributions from retail products, building materials, and diffuse sources" p. 65).

168.   DEHP was first listed on California's Proposition 65 list as a chemical known to the State to cause cancer in January 1988.   It was listed as a chemical known to the State to be a developmental toxin to males in October 2003.

169.   The EPA classifies DEHP as a probable human carcinogen based on sufficient     evidence     of     carcinogenicity     in     animals. http://www.epa.gov/ncea/iris/subst/0014.htm.

170.   Scientists have also reported that exposure to DEHP is a possible contributor to the recent increase in the incidence of atopic dermatitis.   (Takano, *et al.*, "Di-(2-ethylhexyl) Phthalate Enhances Atopic Dermatitis-Like Skin Lesions in Mice," *Environ Health Perspect* 114(8):1266-1269 (Aug. 2006))   Those researchers reported that DEHP enhanced atopic dermatitis at hundred-fold lower levels than the no observed adverse effect level.   (*Id.,* at 1268).

///

46

171.   In April 1998 the EU Scientific Committee on Toxicity, Ecotoxicity and the Environment ("CSTEE") published its report entitled "Phthalate migration from soft PVC toys and child-care articles in which CSTEE discussed Phthalates', including DEHP's, carcinogenicity and developmental/reproductive toxicity.

172.   In 1999, EU decided to temporarily ban DEHP and five other Phthalates from use in toys and childcare articles intended for children under three years old.   According to its Annual Report Carter's does significant business is Europe and thus presumably was aware of this ban.

173.   In January 2002, the Health Canada Expert Advisory Panel on DEHP in Medical Devices issued its final report, stating in part:

> The Panel believes that the concerns about possible ill effects of DEHP are indeed sufficient to restrict use of the product for certain populations and uses.   The Panel worked from the principle that the highest risk will be to:   [] the most susceptible populations.   For example, animal and in-vitro studies suggest the possibility of testicular effects (in males) and cardiac effects.   Newborns have increased susceptibility to a broad range of substances so would be expected to be at greatest risk of DEHP-related toxicity if this were to occur in humans [....]

(EAP-DEHP-Final Report, p15)

174.   The National Toxicology Program has concluded that there is concern for effects of DEHP exposure on development of the male reproductive tract for infants less than one year old and there is some concern for effects of DEHP exposure on reproductive development of male children older than one year.   (NTP-CERHR Monograph on the Potential Human Reproductive and Developmental Effects of Di(2-Ethylhexyl) Phthalate (DEHP), pvii-viii).

175.   The Occupational Safety and Health Guideline for DEHP, published by the Centers for Disease Control and Prevention, states that DEHP may cause

47

adverse health effects following exposure via inhalation, ingestion, or dermal or eye contact.   The guideline also states that skin sensitization and diseases such as contact and/or allergic dermatitis effects from exposure to DEHP may occur. http://74.125.93.104/custom?q=cache:ta7VNElh9ZgJ:www.cdc.gov/Niosh/pdfs/02 36.pdf+dehp+dermatitis&cd=3&hl=en&ct=clnk&gl=us&client=google-coop.

176.   International regulators have also recognized reproductive and/or developmental toxicity risks posed by exposure to Phthalates.  (See EU Scientific Committee on Toxicity, Ecotoxicity and the Environment, *Opinion on phthalate migration from soft PVC toys and child-care articles* (1998)[1]; NTP-CERHR Expert Panel Report, Di-(2-ethylhexyl) phthalate (2000); KEMI Work to reduce the environmental impact of PVC, Report No. 2/01 (2001)[2]; Health Canada Expert Advisory Panel on DEHP in Medical Devices, Final Report (2002)[3].

## 2.   Formaldehyde is Hazardous to Children's Health

177.   Formaldehyde is a high production volume ("HPV") chemical according to EPA.

178.   Formaldehyde has been determined to cause allergic skin reactions and rashes.  In February 2009, researchers led by Michael Dyrgaard Lundov reported that "Formaldehyde, formaldehyde releasers, and MCI/MI contact allergies are much more prevalent.  In the USA, the prevalence of patch test positives from formaldehyde and quaternium-15 was about 9% for each preservative between 1996 and 2002[.]"  "Contamination versus preservation of cosmetics:  a review on legislation, usage, infections, and contact allergy," *Contact Dermatitis 2009: 60: 70, at 74.*

---

[1]       http://64.233.169.132/search?q=cache:NZa9OxewGt8J:ec.europa.eu/health/ph_risk/committees/sct/documents/out12_en.pdf+EU+scientific+committee+on+toxicity+opinion+on+ph thalate+migration&hl=en&ct=clnk&cd=1&gl=us&client=firefox-a

[2]       http://64.233.169.132/search?q=cache:GMUM8OC-BtgJ:www.kemi.se/upload/Trycksaker/Pdf/Rapporter/Rep2_01_sum.pdf+KEMI+work+to+reduce+the+environmental+impa ct+of+PVC&hl=en&ct=clnk&cd=1&gl=us&client=firefox-a

[3]       http://www.hc-sc.gc.ca/dhp-mps/md-im/activit/sci-consult/dehp/sapdehp_rep_gcsdehp_rap_2002-01-11-eng.php

48

179.   The EPA has determined that formaldehyde is a probable human carcinogen based on limited evidence in humans and sufficient evidence in laboratory animals.

180.   California's Proposition 65 list includes Formaldehyde as a substance known to the State to be a carcinogen.

181.   Formaldehyde is used mainly in the production of phenolic, urea, melamine and acetal resins, which have wide use in the production of adhesives and binders for the wood, plastics, textiles, leather and related industries. Formaldehyde is also used extensively as an intermediate in the manufacture of industrial chemicals, such as 1,4-butanediol and 4,4´-diphenylmethane diisocyanate (for polyurethanes and particle-board), pentaerythritol (for surface coatings and explosives) and hexamethylene tetramine (for phenol-formaldehyde resins and explosives).   Formaldehyde is used as such in aqueous solution (formalin) as a disinfectant      and      preservative      in      many      applications. http://www.inchem.org/documents/iarc/vol62/formal.html

182.   The National Toxicology Program's Substance Profile states that Formaldehyde is reasonably anticipated to be a human carcinogen based on limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in experimental animals.   NTP notes that formaldehyde can be absorbed through the skin from cosmetics or contact with other consumer products containing formaldehyde.

183.   In July 1999 the U.S. Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") published its Toxicological Profile For Formaldehyde that specifically linked the chemical to clothing-induced contact dermatitis as follows:

> Human and animal studies indicate that formaldehyde, at appropriate
> exposure levels, can be irritating to the upper respiratory tract and eyes
> with inhalation exposure, to the skin with dermal exposure, and to the

49

gastrointestinal tract with oral exposure. **Reports of allergic dermal sensitization to formaldehyde are widespread and supported by results from animal studies**, but the evidence that formaldehyde sensitizes the respiratory tract is less convincing.

Cases of contact dermatitis caused by formaldehyde released from "no-iron" textiles were described frequently in the literature from the late 1950s until the mid-1970s; after this period, the finishing processes for these types of textiles were changed so that only small amounts of formaldehyde are released after finishing (see Peters and Heese 1997 for review). **In most cases of clothing-induced contact dermatitis, the dermatitis developed specifically in areas of very close contact between the skin and the clothing (e.g., the underarms, the elbows, the insides of the thighs).**

(ATSDR Toxicological Profile/Formaldehyde, p.160, 197) (emphasis added).

184. In 2002, the Organization for Economic Co-Operation and Development Screening Information Data Sets ("OECD SIDS") published its assessment of Formaldehyde, and observed in part "Systemic (e.g., anaphylaxis) or localized (e.g., contact dermatitis) allergic reactions have been associated with formaldehyde exposure (Cronin, 1991, Liden *et al.*, 1993, Lindskov, 1982, Andersen and Maibach, 1984, Trattner *et al.*, 1998, Ebner and Kraft, 1991)." (OECD SIDS, "Formaldehyde," p15).

185. Since then, numerous studies concerning the hazards of Formaldehyde exposure have been published including very recently the 2009 article by Lundov, *et al.*, in *Contact Dermatitis* entitled "Contamination versus preservation of cosmetics: a review on legislation, usage, infections, and contact allergy." Noting that Formaldehyde is used in products including paints, cleaning agents, and printing inks, the authors observe:

50

Formaldehyde, formaldehyde releasers, and MCI/MI contact allergies are much more prevalent.  In the USA, the prevalence of patch test positives from formaldehyde and quaternium-15 was about 9% for each preservative between 1996 and 2002[.]

(*Contact Dermatitis 2009:* 60:70-78, at 71, 74)

186.   The International Agency for Research on Cancer lists Formaldehyde as probably carcinogenic to humans.

187.   As early as January 1986, the European Union (wherein Carter's does significant business) restricted the use of formaldehyde in cosmetics to nail hardeners and only when such products displayed warnings.

188.   In 2002, the World Heath Organization made the following findings with respect to Formaldehyde (http://whqlibdoc.who.int/hq/2002/a73769.pdf)

> Since formaldehyde (also a product of intermediary metabolism) is water soluble, highly reactive with biological macromolecules, and rapidly metabolized, adverse effects resulting from exposure are observed primarily in those tissues or organs with which formaldehyde first comes into contact (i.e., the respiratory and aerodigestive tract, including oral and gastrointestinal mucosa, following inhalation or ingestion, respectively).

> Sensory irritation of the eyes and respiratory tract by formaldehyde has been observed consistently in clinical studies and epidemiological surveys in occupational and residential environments. At concentrations higher than those generally associated with sensory irritation, formaldehyde may also contribute to the induction of generally small, reversible effects on lung function.

51

> For the general population, dermal exposure to concentrations of formaldehyde, in solution, in the vicinity of 1–2% (10 000–20 000 mg/litre) is likely to cause skin irritation; however, in hypersensitive individuals, contact dermatitis can occur following exposure to formaldehyde at concentrations as low as 0.003% (30 mg/litre).

189. In May of 2008, Environment California Research & Policy Center released a report detailing the hazards associated with the presence of formaldehyde in baby products. *See* http://www.environmentcalifornia.org/uploads/LG/n6/LGn6EzV7GRO2iOYjYQwyQQ/Toxic-Baby-Furniture.pdf. The report found, *inter alia*:

> Acute exposure to elevated levels of formaldehyde can irritate skin and respiratory tissue, leading to inflammation and triggering asthma attacks. When formaldehyde is present in the air at levels exceeding 100 parts per billion (ppb), some individuals may suffer from watery eyes; burning sensations of the eyes, nose, and throat; coughing; wheezing; nausea; and skin irritation. People repeatedly exposed to formaldehyde may develop a sensitivity to this chemical, increasing the severity of effects over time.

> However, lower levels of formaldehyde also pose significant hazards, especially over longer periods of time. Scientific studies have linked long-term exposure to formaldehyde with increased odds of developing health

52

problems ranging from asthma to cancer. Babies and young children are particularly vulnerable to harm since they are growing rapidly, with immature and vulnerable respiratory and other organ systems.

190.   The Collaborative on Health and the Environment (CHE), a diverse partnership of individuals and organizations working collectively to advance knowledge and effective action to address growing concerns about the links between human health and environmental factors, has determined there is "strong evidence" linking formaldehyde to contact dermatitis.

191.   The   National   Library   of   Medicine   HazMap (http://hazmap.nlm.nih.gov), an occupational health database designed for health and safety professionals and for consumers seeking information about the health effects of exposure to chemicals and biologicals at work, has determined dermatitis to be an occupational disease associated with exposure to formaldehyde.

192.   In part as a result of the above findings, the EU Cosmetic Directive requires the warning "contains formaldehyde" when Formaldehyde is present in cosmetics due to their contact with the skin.  (Annex II, 13).

193.   Under the Federal Hazardous Substances Act (FHSA), 15 U.S.C.A. § 1261(f), the term "hazardous substance" means:

Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonable foreseeable ingestion by children.

53

194.   The FHSA explicitly prohibits the introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance.

195.   A "hazardous substance" is defined in 15 U.S.C. 1261 as "[a]ny substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer ... if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use." The term "irritant" is in turn defined as "any substance ... which ... on immediate, prolonged or repeated contact with normal living tissue will induce a local inflammatory reaction." 15 U.S.C. 1261(j). Both DEHP and formaldehyde meet the definition of hazardous substance and irritant as defined in the FHSA. In fact, the Consumer Product Safety Commission has specifically determined that "formaldehyde and products containing 1 percent or more formaldehyde" are "strong sensitizers" and thus hazardous substances. 16 C.F.R. 1500.13.

196.   Based in part upon the above findings, Defendants had a particular duty and obligation to avoid exposing its sensitive targeted consumers to such hazardous chemicals as DEHP and formaldehyde, which could adversely affect both the short term and long term safety of the infants, which Carter's claims is one of its top priorities.

**F.   The Defendants Either Were Aware or Reasonably Should Have Known the Tag-less Clothing was Defective and Potentially Unsafe for Infants.**

197.   As detailed above, Defendants were aware, prior to the production of Carter's Fall 2007 line, that the tag-less labels used in that line did not meet Carter's standards for phthalates and that the labels contained formaldehyde. By November, 2007, Carter's was aware of numerous, unprecedented customer complaints which its management recognized as evidence of a defect in the tag-less labels used for the Fall 2007 line. Defendants hold themselves out as well-known

54

and trusted manufacturers of products for children, including infants, toddlers, and preschoolers. Carter's marketing-related representations include: "[w]e provide trusted products that are super comfy, easy care, adorable and don't break the bank," and "[p]roviding trusted products and services. Keeping life simple for our customers. Making solutions for real life. Continually inventing fresh ideas. Creating a truly warm experience."

198. Carter's statements recognize and emphasize the particular trust parents place in Carter's children's products and therefore the additional obligations Defendants take upon themselves in ensuring such products do not contain toxic or unsafe chemicals.

199. Defendants design, manufacture and distribute the defective apparel, and Defendant Carter's sells it through its outlet and retail stores.

200. Defendants could and should have anticipated that infant and children would wear the defective clothing in a manner that causes the tag-less label to come into contact with babies' skin.

201. Defendants could and should have known that children are more susceptible to chemical toxicity than adults and thus should have taken special care to ensure its apparel designed to be worn by children did not contain such toxic and hazardous chemicals.

202. Defendants knew of the toxic and hazardous nature of the defective apparel prior to and during the time it was designing, manufacturing and selling such apparel.

203. Avery and Inter-Trend provided notice to Carter's of the presence of hazardous levels of toxic chemicals in its tag-less label apparel products.

204. Defendant Carter's has admitted it began receiving complaints regarding skin irritations that were attributable to the defective apparel as early as November of 2007.

/ / /

55

205.   Accordingly, Defendants, as self-proclaimed industry leaders in their respective fields and as corporations who do business worldwide (including Europe), knew that by designing, manufacturing, distributing and selling infant and children's apparel containing hazardous and toxic substances including formaldehyde and DEHP, they were subjecting infants and young children to the unnecessary risk of being subjected to skin rashes and burns and exposing them to toxins linked to long term adverse health effects.

## G.   Defendants' Actionable Practices

206.   From 2006 to the present, Defendants negligently designed, manufactured, marketed, advertised, promoted, sold and/or distributed apparel products with heat-transferred or tag-less labels containing hazardous chemicals such as DEHP and formaldehyde that for the reasons detailed above were unreasonably dangerous in their normal and intended use on babies and small children.

207.   Defendants' oversight and quality controls for their manufacturing facilities were inadequate and led to the use of toxic chemicals such as DEHP and formaldehyde on the defective apparel, which were intended for use on babies and small children.

208.   Defendants failed to put into place proper controls to prevent the use of toxic and/or nonconforming chemicals such as DEHP and formaldehyde on the defective apparel, which were intended for use on babies and small children.

209.   Indeed, Defendants deliberately used tag-less labels that they knew contained DEHP and other phthalates in excess of their own mandatory standards and elected to avoid use of formaldehyde free tag-less labels which were slightly more costly than labels known to contain formaldehyde.

210.   Defendants failed to properly screen products during and immediately after the manufacturing process to ensure that Carter's apparel products containing

/ / /

56

heat-transferred or tag-less labels were safe for their intended use on babies and small children prior to placing them into the stream of commerce.

211.   Once aware that the defective apparel was causing unprecedented injuries to infants and children, Defendants did not retain experts, review medical records, or take other steps to determine the cause of those injuries.

212.   A test report ordered by Avery at Carter's behest to determine whether the tag-less labels caused the reported skin injuries confirmed that the labels were toxic to cells and did not meet international standards.  Nevertheless, the test report was never disclosed to the public or to Plaintiffs.

213.   All defendants made no effort to warn consumers or the public about the toxins in, or injuries associated with, the defective apparel until federal authorities ordered that the public be warned.

214.   Following the required issuance of a public warning, Carter's continued to mislead the public with a campaign of misleading and patently false statements designed to minimize concern about the defective apparel and undermine the warnings issued by concerned parents and other consumers on blogs and to the press.

215.   Plaintiffs are conscientious about their child's apparel and purchased Carter's apparel products based upon the reasonable belief that they were both safe and comfortable.   They have purchased the defective apparel from stores in California, Texas, Michigan and Maryland as designed, and placed their children in such apparel.  As a result of purchasing these products and using them for their intended purpose, Plaintiffs' children suffered an adverse skin reaction in the exact area where the heat-transferred or tag-less label on the defective apparel came into contact with their skin.

216.   As a result of the acts and practices detailed herein and Plaintiffs' and Class members' reasonable belief in the excellence and reliability of such products, and the consequent reasonable belief that such apparel products would not contain

57

toxic chemicals, Plaintiffs and members of the Plaintiff Class were misled or likely to be mislead into purchasing the defective apparel. As sold, the defective apparel containing hazardous chemicals such as DEHP and formaldehyde does not provide attributes and benefits the Plaintiffs and Class reasonably expected to receive, sought and thought they were receiving. As a result, Plaintiffs bought Carter's apparel products containing heat-transferred or tag-less labels that they would not have purchased had Defendants disclosed the material facts detailed herein, which were in their exclusive possession and that they were obligated to disclose or should reasonably have disclosed.

217.    Defendants failed to warn purchasers of the unreasonably dangerous characteristics associated with this defective apparel, including the fact such products contained hazardous chemicals such as DEHP and formaldehyde.

218.    Based on the above material facts and statements, Defendants owed a legal duty to Plaintiffs and Class members to design, manufacture, market, advertise, promote, distribute and sell apparel products containing heat-transferred or tag-less labels without hidden and concealed defects such as the inclusion of DEHP and formaldehyde.

219.    Defendants breached such duty, which directly and proximately caused or resulted in Plaintiffs and Class members suffering injury in fact, a loss of money or property, the personal expenditure of time and resources and/or other forms of economic injuries and damages.

220.    In addition, based on the duties owed to the Class by Defendants not to expose children to toxic chemicals in the clothes they supply for use by babies and small children, plaintiffs and the Class are also entitled as economic damages to the reasonable value of the cost of medically monitoring their children's condition, as the need for medical monitoring is a reasonably certain consequence of the toxic exposure caused by the use of the defective apparel and thus is necessitated as a direct result of such exposure, and is reasonable considering (1) the significance and

58

extent of the standard exposure to such chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease as a result of the exposure, when compared to the  chances of developing the disease had they not been exposed, and the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which these children are at risk; and (5) the clinical value of early detection.

221.     Defendants, in the exercise of reasonable care, should have known the apparel products containing heat-transferred or tag-less labels contained hazardous chemicals such as DEHP and formaldehyde at levels that could injure or harm the babies and small children that Defendants intended would use such products. Plaintiffs and Class Members might have reasonably been expected by Defendants to purchase and/or use the defective apparel and be affected by its defective condition.

**H.      The Conduct at Issue Arises and Emanates from California**

222.     Much of the conduct at issue arises and emanates from California. Specifically, Defendant Avery Dennison is headquartered in Pasadena, California, it maintains research facilities in California and its executives are located in California.

223.     Although Carter's offices are located in Georgia, according to its 2007 Annual Report, it has distribution and warehousing facilities in Chino, California.

224.     Additionally, a significant amount of Carter's apparel products containing heat-transferred or tag-less labels are labeled as being made in China. China sends more its products through the ports in Los Angeles and Long Beach, California than any other port in the United States. *See, e.g.* U.S. Department of Transportation Research and Innovative Technology Administration Bureau of Transportation Statistics, *America's Container Ports: Delivering the Goods,* March 2007, http://www.bts.gov/publications/americas_container_ports/pdf/entire.pdf.

/ / /

/ / /

59

## V.

## CLASS ACTION ALLEGATIONS

225.   Plaintiffs bring this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure.   The requirements of Rule 23 are met with respect to the classes defined below.

226.   Plaintiffs bring their claims on their own behalf, and on behalf of the following class:

> All persons in the United States (or such states as the Court may find appropriate) who purchased and/or acquired Carter's apparel products containing heat-transferred or "tag-less" labels and who were damaged thereby.

227.   Plaintiffs Lindsey Webb and Jayme Sanchez also bring a breach of implied warranties claim on her own behalf, and on behalf of the following sub-class (Subclass 1):

> All persons in the United States who purchased Carter's apparel products containing heat transferred or "tag-less" labels from a Carter's outlet and/or Carter's retail store and who were damaged thereby.

228.   Plaintiffs, Jayme Sanchez, Kina Abrams and Anastasia Booth bring a breach of implied warranties claim on their own behalf, and on behalf of the following sub-class (Subclass 2):

> All persons in Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, Oklahoma, Pennsylvania, Texas, Tennessee, Washington, Vermont and Virginia who purchased

///

60

Carter's apparel products containing heat-transferred or "tag-less" labels and who were damaged thereby.

229. Plaintiffs reserve the right to amend or modify their Complaint and/or Class definitions after appropriate discovery and/or a Motion for Class Certification.

230. Members of each Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Each Class includes thousands if not hundreds of thousands of individuals geographically dispersed throughout the United States. The precise number and identities of Class members are unknown to Plaintiffs but can be obtained through notice and discovery. Notice can be provided through a variety of means including publication and notices at retail outlets, including Carter's outlets, the cost of which is properly imposed upon the Defendants.

231. Plaintiffs will fairly and adequately protect the interests of all class members and has retained counsel competent and experienced in class and consumer litigation.

232. Plaintiffs' claims are typical of the claims of each Class and all Class members sustained similar injuries arising out of the conduct challenged in this action. Each Class is ascertainable and there is a well-defined community of interest in the questions of law and/or fact alleged since the rights of each class member were infringed or violated in a similar fashion as a result of Defendants' wrongdoing. The injuries sustained by Plaintiffs and members of each Class flow, in each instance, from a common nucleus of operative facts – Defendants' manufacture, marketing, distribution and sale of the defective apparel without disclosing material facts regarding the presence of hazardous chemicals that they were obligated to disclose or should have disclosed .

233. There are questions of law and fact common to each Class member that predominate over any questions solely affecting individual class members.

61

Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and each Class member. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

234. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.

235. Defendants have acted or have refused to act on grounds generally applicable to each Class member thereby making it appropriate to grant final declaratory and injunctive relief with respect to each Class as a whole.

## COUNT I: BUSINESS AND PROFESSIONS CODE §17200, *ET SEQ.* – UNFAIR BUSINESS ACTS AND PRACTICES

### (Against All Defendants)

236. Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

237. By designing, manufacturing, distributing and selling the defective apparel containing known hazardous chemicals such as formaldehyde and DEHP at levels sufficient to cause infants and children to suffer contact dermatitis, burns, rashes and other injuries, but not disclosing the presence of such chemicals in products admittedly designed to be used by babies and small children since 2006, Defendants engaged in conduct that constitute unfair business acts and practices.

238. The need to disclose such material facts are tethered to legislatively declared policies including California's Proposition 65, California Health and Safety Code § 25249.6, California Health & Safety Code § 10893, the Consumer Product Safety Act and the Federal Hazardous Substances Act, 15 U.S.C.A. § 1261(f).

239. By committing the acts and practices described above beginning in 2006, each Defendant has, in the course of business and at all material times,

62

exposed infants and children to DEHP and formaldehyde, chemicals known to the State of California to cause cancer or reproductive toxicity, without first giving clear and reasonable warning to such individuals, within the meaning of California Health and Safety Code § 25249.6.

240.   By committing the acts and practices described above beginning in 2006, each Defendant has, in the course of business and at all material times, exposed infants and children to DEHP and formaldehyde, hazardous substances and irritants as defined in the FHSA.

241.   Plaintiffs and other members of the Class who purchased the defective apparel, suffered substantial injury by virtue of buying a product they would not have purchased had the true facts been disclosed.

242.   There is no benefit to consumers or competition by Defendants' failure to disclose the material fact that the defective apparel contained hazardous chemicals including DEHP and formaldehyde.  Indeed, the harm to consumers and competition is substantial.

243.   Plaintiffs and other members of the Class who purchased Carter's apparel products containing heat-transferred or tag-less labels in question made by the Defendants had no reasonable way of discerning that the apparel they bought contained hazardous chemicals including DEHP and formaldehyde.   Thus, they could not have reasonably avoided the injury suffered because neither the products nor other promotional materials included any statement disclosing the presence of such hazardous chemicals.

244.   The gravity of the consequences of Defendants' conduct outweighs any justification, motive or reason therefore, particularly considering the available legal alternatives that exist in the marketplace (such as disclosing these facts or not using a manufacturing method that results in such chemical exposure).  Based on the duties Carters' claims it has imposed on itself and other it works in concert with in terms of making the safety of infants and small children a top priority, such

63

conduct is immoral, unethical, unscrupulous, offends established public policy as detailed above and/or is substantially injurious to Plaintiffs and other members of the Class.

245.   Defendants' unfair business practices and acts were exacerbated by their misrepresentations and omissions regarding the defective apparel, including the misleading "A Message From Carter's On Tag-Less Labels" posted on its website. (Exhibit E to Plaintiffs' Third Amended Complaint).

246.   If these material omitted facts had been disclosed as Defendants were obligated to do, Plaintiffs and members of the Class would not have purchased the defective apparel.  Thus, as a result of these unfair business practices, Plaintiffs and Class members have suffered injury in fact and lost money or property as set forth above, and Defendants have been unjustly enriched at the expense of Plaintiffs and the other members of the Class.   Pursuant to Business and Professions Code §17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and such other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants saved as a result of its wrongful acts and practices detailed herein, and/or restoring to any person in interest the money paid for Carter's apparel products containing heat-transferred or "tag-less" labels by ordering the payment of full restitution plus interest.

247.   WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II:  BUSINESS AND PROFESSIONS CODE §17200, *ET SEQ.*
## UNLAWFUL BUSINESS ACTS AND PRACTICES
### (Against Carter's)

248.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

249.   Such business acts and practices of Carter's and Avery Dennison as described above constitute unlawful business acts and practices.

64

250. The business acts and practices alleged above are unlawful as a breach of an implied warranty of fitness for a particular purpose under California Commercial Code § 2315, breach of implied warranty of merchantability under California Commercial Code § 2314, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, violations of Cal. Civ. Code §1750, violations of California Business and Professions Code § 17500 and the Federal Hazardous Substances Act, 15 U.S.C.A. § 1261(f). Plaintiffs reserve the right to identify additional laws violated by defendants' conduct as further investigation and discovery warrant.

251. If the material omitted facts regarding the presence of hazardous chemicals in the defective clothing had been disclosed as Defendants were obligated to do, Plaintiffs and members of the Class would not have purchased the defective apparel. As a result of Defendants' unlawful business acts and practices, Plaintiffs and Class members have suffered injury in fact and lost money or property as set forth above, and Defendants have been unjustly enriched at the expense of Plaintiffs and the other members of the Class. Plaintiffs and the Class, pursuant to Business and Professions Code §17204, are entitled to an order of this Court enjoining such future conduct on the part of Defendants, and such other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants' saved as a result of its wrongful acts and practices detailed herein, and/or restoring to any person in interest the money paid for Carter's apparel products containing heat-transferred or "tag-less" labels by ordering the payment of full restitution plus interest.

252. WHEREFORE, Plaintiffs pray for relief as set forth below.

/ / /

/ / /

/ / /

65

## COUNT III: BREACH OF IMPLIED WARRANTIES

### (Against Defendant Carter's by Plaintiffs Webb and Sanchez on Behalf of Subclass 1)

253.   Plaintiffs Webb and Sanchez repeat each and every allegation contained in the paragraphs above and incorporates such allegations by reference therein on behalf of Subclass 1.

254.   In addition to designing and manufacturing the defective apparel, Carter's also sells its clothing directly through its outlet and retail stores.  Plaintiffs Webb and Sanchez purchased pieces of the defective apparel directly from Carter's brand retail stores in California and Texas.

255.   Plaintiffs Webb and Sanchez bring their claim for breach of implied warranty of fitness for a particular purpose and breach of implied warranty of merchantability on their own behalf, and on behalf of all persons in the United States who purchased Carter's apparel products containing heat transferred or "tag-less" labels from a Carter's outlet and/or retail store.

256.   Every sale of the consumer goods here at issue that were sold at retail by Carter's is accompanied by an implied warranty that the apparel products for infants and children containing heat-transferred or tag-less labels in question were merchantable, i.e., are fit for the ordinary purposes for which such goods are used, of the same quality as those generally acceptable in the trade, and would pass without objection in the trade or industry.  In addition, as the retailer or distributor of such products, Carter's had reason to know at the time of sale that the defective apparel at issue would be acquired by consumers for a particular purpose, and that the buyers were relying on Carter's skill or judgment to furnish suitable goods for that purpose.  The defective apparel products containing heat-transferred or tag-less labels at the time of sale and when delivered to Plaintiffs and Class members did not conform to such implied warranties in that they were not free from defects and not fit for the ordinary purposes for which they are used.  Specifically, the defective

66

apparel intended to be worn by infants and children contained hazardous chemicals such as DEHP and formaldehyde, and exposure to such chemicals would not reasonably be an intended or expected consequence of such use. The failure of the Carter's clothing at issue to have expected quality – that is, to be free of hazardous chemicals like DEHC and formaldehyde – was a substantial factor in causing Plaintiffs' harm.

257.   Carter's has failed or refused to replace or repair the defects in the Carter's apparel products containing heat-transferred or tag-less labels free of charge and/or the warranty has failed in its essential purpose, causing Plaintiffs and the Class to suffer injury and damages.

258.   To the extent it is necessary, the notice provided by Plaintiffs Webb and Sanchez to Carter's satisfied any notice requirement that may be required by law.

259.   Carter's has failed or refused to correct this defect in the Class members' apparel products containing heat-transferred or tag-less labels despite having received complaints from Class members that their children had suffered severe skin reactions as a result of wearing the defective apparel, and despite having had a reasonable opportunity to do so.

260.   As detailed above, Carter's actively suppressed the material fact the defective apparel contained hazardous chemicals such as DEHP and formaldehyde. Plaintiffs and the Class could not reasonably have had knowledge of facts sufficient to have discovered the cause of such injury or the breach of warranty, as it was extremely difficult (if not impossible) for the Class members to detect the presence of DEHP or formaldehyde in the defective apparel.

261.   Carter's manufactured and sold directly to Sub-class 1 Members (including Plaintiffs Sanchez and Webb) apparel products containing hazardous chemicals such as DEHP and formaldehyde that were not in merchantable

/ / /

Third Amended Class Action Complaint        Case No. 2:08-CV-07367-GAF (MANx)

1   condition, were not fit for their ordinary or particular purpose, and/or would not

2   pass without objection in the trade.

3       262.   As a result of this breach of warranty, Plaintiffs and the Class members

4   have suffered both direct and incidental damages as described herein.

5       263.   WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray

6   for relief as set forth below.

## COUNT IV: VIOLATION OF MAGNUSON-MOSS ACT

## (15 U.S.C. §2301 et seq.)

### (Against Carter's)

10      264.   Plaintiffs repeat and reallege all preceding paragraphs, as if fully set

11  forth herein.

12      265.   Plaintiffs and the Class are consumers as defined in 15 U.S.C.

13  § 2301(3).

14      266.   Defendants are suppliers and warrantors as defined in 15 U.S.C. §2301

15  (4)(5).

16      267.   The defective apparel containing hazardous chemicals such as DEHP

17  and formaldehyde is a consumer product as defined in 15 U.S.C. §2301(6).

18      268.   By reason of the conduct set forth above, Defendants have breached

19  implied warranties that by operation of law apply to the sale of the defective

20  apparel at issue.

21      269.   To the extent it is necessary, Defendants have been provided with

22  notice of their alleged breach of implied warranties, and have failed to correct such

23  breach.

24      270.   By reason of Defendants' breach of its implied warranties, Defendants

25  have violated the statutory rights due the Plaintiffs and the Class pursuant to the

26  / / /

27  / / /

28  / / /

68

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and the Class and entitling them to the relief permitted under this Act.

### **PRAYER FOR RELIEF**

As a result of the above allegations, Plaintiffs requests the following relief:

1.      An Order certifying that each class and sub-class be maintained as a class action;

2.      For a judgment of the Court to restore, by way of restitution, refund or reimbursement, to any person in interest any money paid to and/or acquired by the Defendants as a result of their illegal conduct, and ensuring all excessive and ill-gotten monies obtained by Defendants as a result thereof are disgorged by them with interest thereon to the persons affected by such acts and practices;

3.      For all actual, incidental, consequential, punitive and/or statutory damages as provided for by law, or other monies expended by Plaintiffs and members of the Class including, but not limited to, any monies expended for these products, any medical-related expenses incurred as a result of the use of such products or the economic costs for incurring ongoing medical monitoring or treatment;

4.      For preliminary and permanent injunctive relief prohibiting, restraining and enjoining Defendants from engaging in the conduct complained of herein, including:

        a.      Failing to implement proper quality control measures or adequately monitor the manufacturing and design of the defective apparel;

        b.      Failing to adequately monitor and inspect the quality of the defective apparel;

        c.      Failing to warn of the dangers of the defective apparel including, but not limited to, the fact its apparel products containing heat-transferred or tag-less labels contain chemicals and/or other

69

adulterants such as DEHP and formaldehyde, which are extremely dangerous and cause severe skin reactions; and

d.    Failing to correct the misperceptions created by their November and December of 2008 public statements regarding the products in question, thereby requiring corrective disclosures and advertising be made.

5.    An Order directing the Defendants to immediately take all reasonable steps to ensure the defective apparel is removed from the stream of commerce, including, but not limited to, directing, encouraging and facilitating the removal of the defective clothing from any and all retail outlets, as well as to inform and educate any and all retail sellers of the defective apparel of the nature of the defect, as well as the necessary procedures that must take place if/when a customer seeks to return the defective apparel;

6.    For an award of attorneys' fees pursuant to, *inter alia*, Civil Code § 1780, Code of Civil Procedure § 1021.5 and the Magnuson-Moss Warranty Act and the other laws referenced herein to the extent available under such laws;

7.    For costs of suit herein incurred;

8.    Pre and post-judgment interest; and/or

9.    For such other and further relief as this Court deems appropriate or which is allowed for in law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  January 29, 2010            THE CONSUMER LAW GROUP

By: _____
        Alan M. Mansfield
        alan@clgca.com

        9466 Black Mountain Rd., Suite 225
        San Diego, CA 92126
        Tel: (619) 308-5034
        Fax: (888) 341-5048

70

Third Amended Class Action Complaint          Case No. 2:08-CV-07367-GAF (MANx)

WHATLEY DRAKE & KALLAS, LLC
Joe R. Whatley, Jr., Esq.
jwhatley@wdklaw.com
Edith M. Kallas, Esq.
ekallas@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
FAX: (212) 447-7077

Thomas J. Butler, Esq.
tbutler@wdklaw.com
2001 Park Place North, Suite 1000
Birmingham, AL 35203
Tel: (205) 328-9576
FAX: (205) 328-9669

EMERSON POYNTER LLP
John G. Emerson, Esq.
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX  77058-2610
Tel: (281) 488-8854
FAX: (281) 488-8867

Scott E. Poynter, Esq.
scott@emersonpoynter.com
Christopher D. Jennings, Esq.
cjennings@emersonpoynter.com
500 President Clinton Ave., Ste. 305
Little Rock, AR  72201
Tel:  (501) 907-2555
FAX:  (501) 907-2556

BRANSTETTER STRANCH &
   JENNINGS PLLC
James G. Stranch III, Esq.
jims@branstetterlaw.com
J. Gerard Stranch, IV, Esq.
gerards@branstetterlaw.com
227 Second Avenue North, Fourth Floor
Nashville, TN  37201-1631
Tel: (615) 254-8801
FAX:  (615) 250-3937

JIGARJIAN LAW FIRM
Robert A. Jigarjian
jigarjianlaw@gmail.com
128 Tunstead Avenue
San Anselmo, CA  94960
Tel: (415) 341-6660
Fax: (415) 459-6816

Attorneys for Plaintiffs

71

Exhibit A



EX. A
Page 1

EX. A
Page 2

EX. A
Page 5

Exhibit B



EX. B
Page 7

Exhibit C



Exhibit D

Exhibit E

# carter's





© 2008 The William Carter Company | Disclaimer | Privacy Policy | Investor Relations | Contact Us

Drown/Ho legal notice. Please click here to read.

Just One Year® | Child of Mine®

EX. E
Page 12

carter's

EX. E
Page 13

## a message from carter's· on "tag-less" labels

Carter's has received reports that some infants with sensitive skin could be allergic to heat-transferred, or "tag-less," labels used in baby and infant clothing, including Carter's clothing. Children with such an allergy may develop a localized rash in the general area of the label on the upper back. Naturally, we are very concerned about any child who may have had a skin rash while wearing our garments, and we have been looking into this matter thoroughly.

We have conducted an internal review of the product and test results, required our label manufacturers to do the same, and coordinated with several independent experts, including physicians, to evaluate their analyses. Our review and testing provide no indication that the labels contain any known skin irritants or abrasive chemicals, or that such a rash is anything beyond a rare allergic reaction to an otherwise safe product. We have received reports of rashes on a very small fraction of 1% of the garments that we've sold with these labels.

Nevertheless, we have been working closely with the U.S. Consumer Product Safety Commission and on October 25, 2008 we issued a joint advisory to alert consumers to the situation.

The reported skin rashes have been associated with tag-less labels used in our Fall 2007 product line. These labels have a solid, rather than stenciled, background. Prior and current Carter's product lines utilize labels with stenciled backgrounds and have not been linked to skin rashes.

If your child develops such an allergic reaction, you should stop using the garment that caused the reaction. If the condition persists, please contact your pediatrician for advice. You may return any item that you are not satisfied with for a full refund. Our Consumer Affairs staff can help with that return.

Carter's is committed to being the industry leader in product safety and quality. All of our products must pass rigorous third-party testing to ensure they meet the highest safety and quality standards and are compliant with all laws and regulations. We take pride in knowing that parents rely on us to provide trusted products that help make their lives simpler. As always, Carter's is here to answer any questions or concerns you may have. Please feel free to contact our Consumer Affairs center anytime at 1-888-282-4674 or by e-mail at consumer@carters.com.

### Frequently Asked Questions About "Tag-Less" Labels

**How can parents tell if they have one of the labels from Fall 2007?**
These labels have a raised surface with a solid, rather than stenciled, background.



Fall 2007 Label with solid background, which has been associated with rashes.



Spring 2008 Label with stenciled background, which has *not* been associated with rashes.

**What should I do if my child has a reaction to a tag-less label?**
You should stop using the garment that caused the reaction. If the condition persists, please contact your pediatrician for advice. We also encourage anyone with questions or comments to contact us at 1-888-282-4674 or by e-mail at consumer@carters.com.

**Is this reaction serious?**
It is our understanding that the reaction is a type of allergic reaction called contact dermatitis and that it generally clears up completely within a matter of days after removal from contact with the allergen. If the condition persists, please contact your pediatrician for advice.

**What about the reports that this isn't an allergy but is actually a "chemical burn?"**
At this point, all of the information we have received from our doctors, researchers, label manufacturers and even many consumers, points to this being an allergic reaction.

We have been assured by our label manufacturers and other experts that these labels contain no abrasive chemicals or irritants. The doctors and experts we've spoken to told us that if this reaction was a "chemical burn," then nearly everyone

EX. E
Page 14

who came in contact with the labels would have had the same reaction. And that's just not what we are seeing; it continues to be a very rare reaction.

**What is in the labels?**
We purchase the tag-less labels directly from multiple U.S.-based label suppliers. The suppliers are aware of our quality and safety standards and have provided us with third-party test results that indicate that the labels are in compliance with all existing safety and quality standards. The label contains the standard ink formulation used by many companies on literally billions of garments in the United States. The label is applied by means of a standard screen transfer, similar to an iron-on screen print, the same type of technology used for many years and on many types of garments. The specific ingredients and relative percentages of the ink formula for the label vary depending on the colors and style of the particular label, but it is our understanding from the manufacturers that it is generally the same type of ink that has been used on clothing for many years ranging from children's clothing to adult intimate apparel.

It appears that a very small percentage of children can be allergic to one or more ingredients in the labels. The solid, rather than stenciled, background on the Fall 2007 labels appears to have produced a more pronounced and noticeable reaction among those children who are most allergic to the ink. For stylistic reasons, Carter's has switched back to the smaller labels for our Spring and Fall 2008 line.

**Where are these products manufactured?**
We purchase the tag-less labels from multiple U.S.-based suppliers. The garments in which these labels were used were manufactured in various foreign countries, including Guatemala, China and the Philippines.

**What kind of testing do you do on Carter's clothing before it is available to consumers?**
Carter's garments fully comply with all existing quality and safety regulations applicable to children's clothing. There are approximately 50 different tests and standards applicable to these garments. These include strict standards for: flammability, strength, colorfastness, fit, comfort and content. The various testing that we perform on all our garments allows us to check for known irritants, toxins and other substances that are banned from children's clothing. Each year our suppliers must also provide us with certification ensuring their products contain no banned substances.

**Why did Carter's originally switch to tag-less labels?**
Switching to tag-less labels was done in an effort to respond to consumers' concerns. For years the clothing industry dealt with complaints about fabric tags causing irritation in people's necks, particularly children. In response, Carter's (and the apparel industry in general) moved towards tag-less labels as a general improvement for our consumers.

**Is there a recall on the Fall 2007 products?**
Carter's has used tag-less labels on hundreds of millions of products and our experience with these labels is that they are safe. Carter's has coordinated directly with the U.S. Consumer Product Safety Commission (CPSC) on this issue.

**If there is no recall then why did Carter's issue a release with the CPSC?**
Naturally, we are very concerned about any child who may have had a skin rash while wearing our garments. We worked closely with the CPSC to issue a release to make sure that consumers are alerted to the situation in the event that their infant has an allergic reaction. We are continuing to work closely with the CPSC to assess updated information we receive and how we communicate that to our customers.

**What do I do if I'm not satisfied with my Carter's clothing?**
As is our standard policy, consumers may return any item that they are not satisfied with for a full refund. Our Consumer Affairs staff can be reached at 1-888-282-4674 or by email at contactus@carters.com, and will help with that return.

**How long does the refund process typically take and what can I expect?**
Generally a refund will take about three weeks from the initial contact a consumer makes with us. After the contact, we send the consumer a prepaid envelope or box. Once we receive that envelope or box back, together with the corresponding receipt, if available, we categorize and total the products, provide the information to accounting, and then send out the refund check.

© 2006 The William Carter Company | Disclaimer | Privacy Policy | Investor Relations | Contact Us          Just One Year® | Child of Mine®

EX. E
Page 16

Exhibit F

Case 2:08-cv-07367-GAF-MAN    Document 122    Filed 02/01/10    Page 93 of 106    Page ID #:1202

Jump to: ZRecs Home | Z Recommends | PRIZEY | Polliwogged | The Tranquil Parent | Gardenaut | Punnybop | The ZRecs Guide

Get Z Recommends via RSS or email

About Z Recommends | Advertise on Z Recommends | Contact Us

Advertisements

blog advertising is good for you

Ads by naturalpath



Search Amazon.com:
All Products
Keywords:

Search New and Used
amazon.com.

## Carter's, on the record: An interview with Michael Casey, CEO

By Jeremiah | November 14, 2008



Michael Casey, CEO of Carter's, Inc.

Michael Casey, the CEO of Carter's, Inc. was kind enough to grant us an interview on the evolving story of children's allergic reactions to some of the company's tagless labels. We used the opportunity to get official answers to a lot of questions that had been bothering us since we started investigating the issue back in August.

Casey has been at Carter's for 15 years, and was the company's CFO before being appointed to the CEO post this summer. He warned me at the beginning of our phone conversation that there might be areas he would be less able to discuss given the lawsuit filed against the company earlier this week, but there were few questions he avoided answering, and we appreciated his frankness. Almost everything you're about to read here has not been published anywhere before.

### Going tagless

Casey stated that Carter's infant garments have had tagless labels since "the end of 2005." I asked him if there was a cost savings involved in switching from cloth tags to tagless labels. "That's not why we made the change," he said. "We made the change because consumers overall find tagless garments to be more comfortable." Janell Cleveland, Carter's Senior Director of Consumer Affairs, later told us that while there is a cost savings associated with shifting from cloth to synthetic tags, tagless labels are actually more expensive than either type of tag.

I suggested to Casey that a decline in fabric tag quality and a shift from natural fabrics to synthetics for clothing tags may have caused the problem tagless labeling attempted to solve, but Casey did not agree with this assessment. "It isn't consistent with my experience," he said.

### Design changes

Carter's maintains that the problem is isolated to its Fall 07 clothing, and although we have received a few reports of consumers whose infants have had reactions to other lines, the vast majority of the reports we have seen do implicate the Fall 07 line. For that release of the company's infant clothing, Carter's redesigned its tag to have a solid background with a relatively large imprint. When it came time to tinker with products for the next line (Spring 08) they switched to a design with a clear background and much less ink.

One key to understanding how the allergic reaction issue evolved at Carter's is an awareness of their product development and release cycle. Casey was unable to nail down exactly when the company received its first complaints

Ads by naturalpath

Browse Z Recommends

recent posts
categories
blog archive
blogs we read

Looking for something?

Search  ☑ Z Recommends
        ☐ All ZRecs blogs

for [                    ] »
        Advanced search

The ZRecs Guide



ZRecs Safer

The ZRecs Guide
to Safer Children's Products

1118 products, 172 brands, and counting...

Conversations on Z Recommends

Jennifer said: @Susan, we didn't - have you? Sounds like a recipe for green, or do they bleed red? @Diana,... [Natural Easter egg dyeing] »

Adriana said: I'm so happy with our high chair- a simple wood high chair. It's gone through 2 boys and now our... [Evenflo high chairs are falling apart] »

CanCan (MomMostTraveled) said: I'm so excited. Whoever wins, can I come tour your room? ;) [Another exciting BlogHer giveaway! Three nights at the Chicago Sheraton] »

eedgmkbp said: frfutcpx uwoltthj oempaddc http://kfgyhihf.com gjmjntmb sgdfjsmm [Sassy releases new list of BPA-containing products] »

optruwch said: gyljybvm http://mcdauvhn.com xhegcjm ephyuzwm rbvhjcju uvmgvepk [Hell just froze over] »

Conversations on all ZRecs sites

Get ZRecs' monthly newsletter



Sign up for ZRecs' monthly newsletter for an extra chance to win a $250 shopping spree from Chronicle Kids, plus a new prize every month! Sign up now

? Learn about our privacy policy

Advertisements

Advertisements          Advertisements

blog advertising is good for you

EX. F
Page 17

Case 2:08-cv-07367-GAF-MAN   Document 122   Filed 02/01/10   Page 94 of 106   Page ID #:1203

about the labels, but Cleveland has since informed us that the company began receiving complaints in November 2007. "The new Spring 2008 label (the design with less ink) actually started being used in production the first week of June 2007," she wrote in an email to Z Recommends. "We received our first contact about a rash early in November 2007. The thing that most people don't realize is that the Fall 2007 product was shipping from May 2007 through September 2007."

In other words, the company had already redesigned the label before a single case of skin irritation had been reported. Casey affirmed that the change in design from the Fall 07 line had nothing to do with any complaints that might have been received about irritation. "The label for Spring 08 was not changed for any reason other than aesthetics," he said.

Casey also offered up the previously undisclosed name of the manufacturer of their labels, Avery-Dennison, a well-known brand among households for its paper labels and a leading manufacturer of heat-transfer labels. Casey said Avery tagless labels are used in "billions" of garments each year, in clothing both for children and for adults. "In using these labels, we are in very good company," he said.

But there's another chapter to this story, and only time will tell if it is relevant to its final telling.

## The switch to a "greener" tag

A crucial element that was missing from this story prior to our interview is that Carter's has since switched its label formulation, specifically for the Spring 09 line, which should be hitting stores soon. Through their Fall 08 clothing lines, Carter's used the supplier's Halo-Free Heat Transfers; for the Spring 09 line, they are using Halo-Free ECO Heat Transfers. (The term "halo-free" refers to the fact that both labels lack a bordering translucent "stamp" area and only show printing where ink is desired.)

The exact chemical formulations and ingredients of such products are carefully guarded trade secrets, and may not even be available to the companies that make use of them. Where technical data is absent, however, marketing materials can provide some clues. The benefits of this "ECO" label type, as outlined in Avery-Dennison's product brochure, include:

- Eco-Friendly: water-based inks, PVC-free, no harmful substances
- Meets Öko-Tex 100 Class 1 - suitable for skin contact for babies
- Contains no Azo dyes, no formaldehyde, heavy metals or vinyl products

It may be tempting to simply invert these bullet points to garner a "shadow list" of descriptors of the company's non-"ECO" labels. The implications, of course, are that the standard Halo-Free labels may *not* use water-based inks, and *may contain* PVC, Azo dyes, formaldehyde, heavy metals, or vinyl products; there are no claims in the standard Halo-Free Heat Transfer's label that it is free of any of these things. But in fact, this is not sufficient to establish with certainty that these standard labels *do* contain any of those specific substances, although the possibility is there; since they were likely not even submitted for potential certification under the strict Öko-Tex 100 standard, there is a chance that even Avery may not know exactly what is in them, beyond what the government (using ASTM standards) requires them to test for.

Cleveland stated that independent testing of the labels conducted by Carter's confirmed that the standard labels did not exceed any ASTM limits for Azo dyes, heavy metals, or lead, and had "never contained formaldehyde."

Cleveland stated to Z Recommends that the shift from one formulation to another was consistent with a general trend within the industry to improve on previous formulations of tagless labels. She could not comment on whether Avery-Dennison or Carter's first suggested the switch, but said she believed that Avery-Dennison planned to eventually phase out the old style of labels in favor of this alternative formulation. "Just as we're always working to innovate to make our products safer, they are too," she said.

One possible cause for a rapid shift towards the new labels, at least among producers of children's garments, is the onset of a federal ban on three phthalates and interim restrictions on three others. Given that the "ECO" labels are advertised as PVC-free, and PVC frequently contains phthalates as a softener, it seems entirely plausible that Avery-Dennison, as well as their clients, are moving rapidly to ensure they stay in compliance with the evolving regulations in this area, and that the tags that have been used by Carter's and

Case 2:08-cv-07367-GAF-MAN   Document 122   Filed 02/01/10   Page 95 of 106   Page ID
#:1204

other brands up to this point have contained them. Phthalates are the
suspected chemical of concern logged in ZRecs Guide listings of Carter's Infant
apparel on September 28, 2008.

Interestingly, Öko-Tex certified materials are guaranteed to be free of even
more things not mentioned in Avery's marketing materials, but equally
relevant to the potential problems with Carter's Fall 07 clothing: namely,
allergy-inducing dyes, pesticides, and preservative phenols. From Wikipedia:

> The Öko-Tex label is not only a recognized benchmark for the
> consumer – it also serves as an additional quality assurance tool for
> the manufacturer. The concept has become established as a safety
> standard throughout the textile manufacturing chain and enables
> checks to be made for any harmful substances at each stage in the
> production process. The test samples are tested by the independent
> Öko-Tex Institutes for their pH-value, formaldehyde content, the
> presence of pesticides, extractable heavy metals, chlorinated organic
> carriers and preservatives such as pentachlorophenol and
> tetrachlorophenol. The tests also include checks for any MAC amines
> in azo dyestuffs and allergy-inducing dyestuffs. The use of flame-
> retardant and biocide finishes is prohibited in the clothing sector. The
> certificates issued are distributed or allocated in line with the
> international guidelines and specifications of the Öko-Tex Test
> Association. [Link]

## The company response

When injury reports began surfacing in November 2007, company
representatives fell back on Carter's standard policy of accepting returns
directly from consumers who had any complaints about a product that could
not be resolved by other means. This strategy has guided their response as
the problem has grown in scope over the subsequent year, and remains as the
recourse they provide to consumers. Casey stated that the company contacted
the Consumer Products Safety Commission about the issue after receiving
"some portion of 10 complaints," and kept in close contact with them as the
number of cases increased. Almost a year later, on October 24, 2008 the
company released an advisory through the CPSC for the Fall 07 line and added
a page about the issue to their company website. By that time they had been
contacted by approximately 400 consumers about the issue.

Casey described the process of classifying the condition by showing
photographs to physicians. "The first physician we showed the photographs to,
he took one look at them and said, 'That's contact dermatitis,'" Casey said. "It
wasn't even the kind of thing he had to look up."

Casey confirmed that the company has lab tested not only a variety of sample
garments from their Fall 2007 line, but multiple samples received from parents
whose children had suffered irritation. "There was nothing in that label we
could identify that could cause that kind of reaction," he said, "which led us to
conclude that this is a rare allergic reaction in some babies with highly
sensitive skin." He noted that families of multiple children, including one with
triplets, reported irritation by some but not all of their infants from the same
clothing.

He estimated that the company has been contacted by roughly 800 consumers
regarding the issue, although some of them were calling without an actual
medical case (i.e. they had purchased but not yet used the garments, or were
calling for information or return although their children had not had a
reaction). We discussed the CPSC advisory and I mentioned some consumers'
call for a recall. "Since we launched, the level of inquiries on this... even now,
has not been significant in terms of its relation to the total number of our
garments," he said. "It is some fraction of 1% of the garments from the Fall
07 line."

The difference between contact dermatitis and a "chemical burn," as many
parents (and Z Recommends) had reported as a possible characterization of
the wounds, appears not to be one of degree, but of universality of effect. "A
chemical burn is something that would affect virtually all people in the same
way," Casey said. Something that prompts a reaction in a small subset of
individuals, "even the more extreme cases" - i.e. those with seepage,
blistering, and persistent effects - are still properly classified as contact
dermatitis. I consented to this but observed that the reason the term had been
used was because dermatitis is typically associated with something less
severe, and parents were grasping for terminology that better communicated
the degree of harm. Carter's representatives asked us to stress that the
company relied on physicians to make these assessments.

EX. F
Page 19

### The road ahead

Casey affirmed that Carter's is confident of the safety of its current label formulation, and the switch for the Spring 09 line does suggest to us that the newest Carter's garments, when available, will be far less likely to trigger an allergic response. We will post an image of the label style or other identifying features of these clothes on Z Recommends as soon as we have them. Casey also apologized for the problems the Fall 07 labels had caused for consumers and emphasized the aggressiveness of the company's return program and their decision to issue an advisory, which "has helped bring in a lot of calls" from parents who may not have known what was causing the irritation.

"This has been a major focus of a lot of good people inside and outside this company, and we're very sorry for the problems some of our customers have had. We intend to continue to work very hard to regain the trust of people who have had this disappointing experience with Carter's products."

I'd like to close by revisiting the four points we made about this evolving case in our last big bundle of fresh reporting on the Carter's situation. In that piece I observed that there were four major areas we weren't satisfied were conclusively addressed. In brief, they were:

1. The problematic nature of estimating the number of cases from the number of reports;
2. the nature and characterization of injuries;
3. the scope of the problem in Carter's product line (beyond Fall 07); and
4. the potential implication of other companies in this problem.

As journalists, we believe that item #1 is still a nagging issue. Estimating how many children are affected by this based on how many have reported in to Carter's or the CPSC or both is very messy. I don't think we have a complete picture on this and don't know how or when we'll have one.

Our data for items #3 and 4 is still highly anecdotal; we have received a few reports of problems with Carter's later lines, and regarding items from other brands, but we rarely know if children may have been previously exposed to Carter's Fall 07 items prior to other exposures, or what the relative levels of problems with these other item types are.

Item #2 was, I believe, a misuse of technical terms in an attempt to describe the seriousness of a problem; the fact may be that we (and others) just needed a wake-up call regarding how broad a range of effects and levels of suffering the term "contact dermatitis" encompasses. The fact that such skin irritation can lead to other problems (including a staph infection and hospitalization, in the case of Ava Kunze) do not seem to affect this strict technical classification. Z Recommends apologizes for the error.

### Have Carter's items you'd like to return?

The company's refund program is open to parents with Carter's infant clothing from any season, new or used. Call Carter's at 1-888-282-4674 and they will send you postage-paid packaging based on the number of items you have to return.

Casey estimated that customers who could provide receipts could get a refund within a week. "Then, it's a very simple process," he said, "but nobody keeps receipts for a year." Without a receipt, company representatives had to look up the specific items to "research what the highest price paid for the garments was," which he described as a still-straightforward process but one requiring more time. He stated that returns "should be" processed within two weeks without a receipt. (Our presumption is that this means two weeks from the point when the company has received the garments from the customer, leading up to the mailing of a check; factor in the shipping cycles and I suspect you're looking at a total time of about a month to get your reimbursement.

We also encourage consumers who have experienced problems to continue reporting these cases to the CPSC so the agency can have the best possible understanding of the scope of the issue. They can be reached at 800-638-2772 from 8:30 a.m. to 5 p.m. ET Monday through Friday.

Additionally, if you receive a reimbursement that is not as much as you expected or believe you are owed (as some readers have reported in comments on this blog), we encourage you to call the company back to ask them to address it. If the customer service department can't satisfy you, Michael Casey expressed an interest in our interview in having calls escalated

EX. F
Page 20

to his office if necessary to ensure any problems are resolved.

... .. .. ..        ...    . ..

*Like getting real reporting on consumer issues that affect your children? Subscribe to Z Recommends (via email or RSS) and The Tranquil Parent (also available via email or RSS) and you won't miss any of our investigative reporting, including updates on the Carter's tagless apparel story, as well as getting unbiased product reviews, consumer tips, and down-to-earth parenting and family advice.*

**Categories:** chemical safety, kid and baby clothes

**Share this post:** Delicious | Digg | Kirtsy | Stumble It! | Email

**Related content:**

CPSC releases rash advisory for Carter's tagless apparel. Is it enough?

Advisory panel slams FDA's spin on BPA

KNBC-TV: "We eat blogs for breakfast"

Toxic chemical in drinking water to get a Bush pardon

Tagless got you down? Hanes onesies with tags, $3

Buying organic produce: Is it necessary?

Test run: Green Earth Technologies Car Wash Kit

Dabble a little Dapple on your dishes

Dear TTP: PVC-free and phthalate-free bath mats

Two good reasons to get away from antibacterial cleaners

☐ open links in new window

8 Comments

**1. Janelle [11/14/08]**

Superb interview! I'm going to do a quick summary for the Healthy Child blog and send folks back here for your always impressive comprehensive coverage. Kudos!

**2. Abby [11/14/08]**

Here here! I did not see an effect in my child, but I feel better about Carters after reading this. He was very open with you!

**3. Janet [11/14/08]**

Great job on getting Casey's interview! After reading it and digesting the information, had some thoughts about Carters' investigation. Since Casey will surely read these responses, perhaps he will see our invitation below.

Carters often references their safety investigation of their tagless labels. I am curious though, why haven't they ever contacted us about Ava's case? It seems logical that their investigation would benefit from the data of a case such as Ava's. Carters investigative team has never asked us about Ava. We would be happy to share the data. Carters would see that Ava was diagnosed with a chemical burn from a medical expert. They would see that Ava chronically suffered. Who knows, they might even find an answer to this hazard by looking at her case. We are not part of the lawsuit, we only want answers and we only want full disclosure and appropriate actions.

We made the effort of writing the Executive staff of Carters and only received responses to placate our frustration, not a response of action. The CEO interview in ZRecs just further exasperates us for these reasons: They are sticking to boilerplate responses, falling back on statistical quality thresholds based on fallible data, and they continue to ignore the fact that babies are suffering from their products.

We will continue our quest to compel Carters to do the right thing.

**4. Alisa [11/14/08]**

Thanks for the reporting. My kids haven't had a reaction, but I know what to look for (especially to look in other brands' tagless clothing). I like how Carters was willing to be interviewed and, even without a recall, help parents get their money back. Wish this wasn't an issue to worry about with my favorite under 12months clothing company...

**5. Trish [11/15/08]**

EX. F
Page 21

I have a 32 month old and a 3 month old. I have used new and handed down Carters clothes from the start with both. Neither of my children have, thankfully, had a reaction to the tags. Thank you for staying on top of this story and for the great interview. I feel that Carters is doing what it needs to to keep me as a customer.

© 2008-2009 ZRecs, LLC | About ZRecs | Contact us

**6. Liz [11/20/08]**

Our three month old daughter was hospitalized for her "contact" with the Carter's tag less labels...but it wasn't just the fall 2007 line, it was "Child of Mine" made by Carters that caused actual blisters. I kept the shirt that was covered in the yellow discharge from the blisters that broke open on her back, she also ran a fever. We spent two nights in the hospital not knowing what was wrong with her...not knowing if she had something that the doctors could fix since they all admitted to not seeing anything like it before. I know that we don't matter and that no one cares but, you'd think that after all we've been through, Carter's could do better than a stinkin bear!

**7. Janna [11/22/08]**

Thank you for this reporting. My daughter also had a rash from her tagless onesies that I always just attributed to "heat rash." Luckily for us, it never became severe-- but I'm horrified for the parents who had much worse problems than we did. Carters, it's time for a recall, and time to pay the medical bills for those parents whose kids suffered severe problems. The refund and the bear (lion, actually-- quite cute!) is enough for me... but it's not for them.

Another niggling little thing about what I keep reading that irks me is that they keep referring to this as being a problem for babies with "very sensitive skin." My daughter has never had sensitive skin. She never had any other rash. She doesn't even get diaper rash. So it bugs me a little that they seem to want to fob off this problem as a fault of my child's skin rather than a fault of their product.

I really like Carter's and hope they realize that it's not too late to do the right thing now. I'm sure they didn't set out to hurt anyone... now's the time to make ammends.

**8. Lynn from OrganicMania.com [11/23/08]**

Jeremiah,
Nice job on this interview. It's good to see the CEO of Carter's conducting interviews with bloggers, realizing how many parents are turning to blogs like Z Recommends for in-depth coverage of health and safety issues impacting their children.
Lynn

**Comment on this post**

Name

Email              (will not be displayed)

Website

Message

Accepted HTML <a href>, <b>, <i>

☑ **Remember my info**
☑ **Notify me of later comments on this post**

[Preview]  [Submit]

Next Post                    Previous Post

EX. F
Page 22

1   WHATLEY DRAKE & KALLAS, LLC
    Joe R. Whatley, Jr., Esq.
2   jwhatley@wdklaw.com
    Edith M. Kallas, Esq.
3   ekallas@wdklaw.com
    1540 Broadway, 37ᵗʰ Floor
4   New York, NY 10036
    Tel.:  (212) 447-7070
5   Fax:   (212) 447-7077

6   EMERSON POYNTER LLP
    John G. Emerson, Esq.
7   jemerson@emersonpoynter.com
    830 Apollo Lane
8   Houston, TX 77058-2610
    Tel: (281) 488-8854
9   Fax: (281) 488-8867

10  JIGARJIAN LAW OFFICE
    Robert A. Jigarjian, Esq. (SBN 171107)
11  Jigarjianlaw@gmail.com
    128 Tunstead Avenue
12  San Anselmo, CA 94960
    Tel: (415) 341-6660
13  Fax: (415) 459-6816

14

15  Attorneys for Plaintiffs

16  [Additional counsel appear on signature page]

17            UNITED STATES DISTRICT COURT

18    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

19

20  LINDSEY WEBB, JAYME     )  CASE NO.: CV08-07367-GAF (MANx)
    SANCHEZ, KINA ABRAMS, and  )  (Consolidated with No.
21  ANASTASIA BOOTH, individually  )   CV09-02943-GAF (MANx))
    and on behalf of all others similarly  )
22  situated,                )  **CLASS ACTION**
                        )
23        Plaintiffs,      )  **PROOF OF SERVICE**
                        )
24     v.                )  Party(ies) Served: Defendants
                        )  CARTER'S, INC. & AVERY
25  CARTER'S, INC., and AVERY    )  DENNISON, INC.
    DENNISON, INC.,        )
26                         )  Judge:  Hon. Gary A. Feess
       Defendants.      )
27  _____ )

28

                                     1

1    I, the undersigned, declare under penalty of perjury that I am employed with The Consumer Law Group, whose address is 9466 Black Mountain Road, Suite 225, San Diego, California 92126. I am over the age of eighteen years and not a party to this action; that I served the below named persons the following documents:

**AMENDED SUMMONS;**

**THIRD AMENDED CLASS ACTION COMPLAINT**

[ ]    By personally delivering copies to the person served at the following address:

[ X ]    Via electronic mail to the addresses listed below.

**SEE ATTACHED SERVICE LIST**

[ ]    By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each for collection and mailing pursuant to the ordinary business practice of this office, which mail is deposited with the U.S. Postal Service on the same day at San Diego, California.

[ ]    By Overnight Mail by placing an Overnite/Federal Express Envelope addressed to each of the persons on the service list attached hereto and depositing said envelope in the Overnite/Federal Express Pickup Boxes located at business Park Way and Carroll Canyon Road in San Diego, California 92131.

Executed this ___29th___ day of ___January___, 2010 at San Diego, California.

_Sally Cormier_

SALLY CORMIER

---

PROOF OF SERVICE          2          CASE NO. 2:08-CV-07367-GAF (MANX)

# SERVICE LIST

| | |
|---|---|
| WHATLEY DRAKE & KALLAS, LLC<br>Joe R. Whatley, Jr., Esq.<br>jwhatley@wdklaw.com<br>Edith M. Kallas, Esq.<br>ekallas@wdklaw.com<br>1540 Broadway, 37th Floor<br>New York, NY 10036<br>Tel: (212) 447-7070<br>Fax: (212) 447-7077<br><br>Attorneys for Plaintiffs | WHATLEY DRAKE & KALLAS, LLC<br>Thomas J. Butler, Esq. (*Pro Hac Vice*)<br>tbutler@wdklaw.com<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Tel: (205) 328-9576<br>Fax: (205) 328-9669<br><br>Attorneys for Plaintiffs |
| EMERSON POYNTER LLP<br>John G. Emerson, Esq.<br>jemerson@emersonpoynter.com<br>830 Apollo Lane<br>Houston, TX 77058<br>Tel: (281) 488-8854<br>Fax: (281) 488-8867<br><br>Attorneys for Plaintiffs | EMERSON POYNTER LLP<br>Scott E. Poynter, Esq.<br>scott@emersonpoynter.com<br>Christopher D. Jennings, Esq.<br>cjennings@emersonpoynter.com<br>500 President Clinton Ave., Ste. 305<br>Little Rock, AR 72201<br>Tel: (501) 907-2555<br>Fax: (501) 907-2556<br><br>Attorneys for Plaintiffs |
| JIGARJIAN LAW OFFICE<br>Robert A. Jigarjian, Esq. (SBN: 171107)<br>jigarjianlaw@gmail.com<br>128 Tunstead Avenue<br>San Anselmo, CA 94960<br>Tel: (415) 341-6660<br>Fax: (415) 459-6816<br><br>Attorneys for Plaintiffs | BRANSTETTER STRANCH &<br>JENNINGS PLLC<br>James G. Stranch, III, Esq.<br>jims@branstetterlaw.com<br>J. Gerard Stranch, IV, Esq.<br>gerards@branstetterlaw.com<br>Michael G. Stewart<br>mikes@branstetterlaw.com<br>227 Second Avenue North, 4th Floor<br>Nashville, TN 37201-1631<br>Tel: (615) 254-8801<br>Fax: (615) 250-3937<br><br>Attorneys for Plaintiffs |
| LEWIS BRISBOIS BISGAARD &<br>SMITH LLP<br>Roy M. Brisbois, Esq.<br>brisbois@lbbslaw.com<br>Eric Y. Kizirian, Esq.<br>kizirian@lbbslaw.com<br>221 N. Figueroa Street, Suite 1200<br>Los Angeles, CA 90012<br>Tel: (213) 250-1800<br>Fax: (213) 250-7900<br><br>Attorneys for Defendant Carter's, Inc. | GOLDBERG SEGALLA LLP<br>David S. Osterman, Esq. (*Pro Hac Vice*)<br>dosterman@goldbergsegalls.com<br>301 Carnegie Center Blvd., Ste. 101<br>Princeton, NJ 08540<br>Tel: (609) 986-1300<br>Fax: (609) 986-1301<br><br>Attorneys for Defendant Carter's, Inc. |

1

2

3

4

5

6

7

| DRINKER BIDDLE & REATH, LLP<br>Steven M. Selna, Esq.<br>Steven.selna@dbr.com<br>Beth O. Arnese, Esq.<br>Beth.arnese@dbr.com<br>50 Fremont Street, 20th Floor<br>San Francisco, CA  94105<br>Tel: (415) 591-7500<br>Fax: 415) 591-7510<br><br>Attorneys for Defendant Avery<br>Dennison, Inc. | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  WHATLEY DRAKE & KALLAS, LLC
   Joe R. Whatley, Jr., Esq.
2  jwhatley@wdklaw.com
   Edith M. Kallas, Esq.
3  ekallas@wdklaw.com
   1540 Broadway, 37th Floor
4  New York, NY  10036
   Tel.:   (212) 447-7070
5  Fax:    (212) 447-7077

6  EMERSON POYNTER LLP
   John G. Emerson, Esq.
7  jemerson@emersonpoynter.com
   830 Apollo Lane
8  Houston, TX 77058-2610
   Tel: (281) 488-8854
9  Fax: (281) 488-8867

10 JIGARJIAN LAW OFFICE
   Robert A. Jigarjian, Esq. (SBN 171107)
11 Jigarjianlaw@gmail.com
   128 Tunstead Avenue
12 San Anselmo, CA 94960
   Tel: (415) 341-6660
13 Fax: (415) 459-6816

14 Attorneys for Plaintiffs

15 [Additional counsel appear on signature page]

16

17                     UNITED STATES DISTRICT COURT

18          CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

19

20 LINDSEY WEBB, JAYME            ) CASE NO.: CV08-07367-GAF (MANx)
   SANCHEZ, KINA ABRAMS, and      ) (Consolidated with No.
21 ANASTASIA BOOTH, individually  )  CV09-02943-GAF (MANx))
   and on behalf of all others similarly )
   situated,                      ) **CLASS ACTION**
22                                )
              Plaintiffs,         ) **PROOF OF SERVICE**
23                                )
        v.                        ) Party(ies) Served:  Defendants
24                                ) CARTER'S, INC. & AVERY
   CARTER'S, INC., and AVERY      ) DENNISON, INC.
25 DENNISON, INC.,                )
                                  ) Judge:  Hon. Gary A. Feess
26            Defendants.         )
                                  )
27 _____ )

28

                                   ORIGINAL

                                   1

PROOF OF SERVICE                              CASE NO. 2:08-CV-07367-GAF (MANX)

1    I, the undersigned, declare under penalty of perjury that I am employed with The Consumer Law Group, whose address is 9466 Black Mountain Road, Suite

2   225, San Diego, California 92126.  I am over the age of eighteen years and not a party to this action; that I served the below named persons the following

3   documents:

4   **AMENDED SUMMONS;**

5   **THIRD AMENDED CLASS ACTION COMPLAINT**

6   [ ]   By personally delivering copies to the person served at the following address:

7   [ X ]   Via electronic mail to the addresses listed below.

8   **SEE ATTACHED SERVICE LIST**

9   [ ]   By placing a copy in a separate envelope, with postage fully prepaid, for each

10   address named below and depositing each for collection and mailing pursuant to the ordinary business practice of this office, which mail is deposited with the U.S. Postal Service on the same day at San Diego, California.

11

12   [ ]   By Overnight Mail by placing an Overnite/Federal Express Envelope addressed to each of the persons on the service list attached hereto and

13   depositing said envelope in the Overnite/Federal Express Pickup Boxes located at business Park Way and Carroll Canyon Road in San Diego, California 92131.

14   Executed this ___29th___ day of ____January____, 2010 at San Diego,

15   California.

16

17   SALLY CORMIER

18

19

20

21

22

23

24

25

26

27

28

## SERVICE LIST

| | |
|---|---|
| WHATLEY DRAKE & KALLAS, LLC<br>Joe R. Whatley, Jr., Esq.<br>jwhatley@wdklaw.com<br>Edith M. Kallas, Esq.<br>ekallas@wdklaw.com<br>1540 Broadway, 37th Floor<br>New York, NY 10036<br>Tel: (212) 447-7070<br>Fax: (212) 447-7077<br><br>Attorneys for Plaintiffs | WHATLEY DRAKE & KALLAS, LLC<br>Thomas J. Butler, Esq. (*Pro Hac Vice*)<br>tbutler@wdklaw.com<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Tel: (205) 328-9576<br>Fax: (205) 328-9669<br><br>Attorneys for Plaintiffs |
| EMERSON POYNTER LLP<br>John G. Emerson, Esq.<br>jemerson@emersonpoynter.com<br>830 Apollo Lane<br>Houston, TX 77058<br>Tel: (281) 488-8854<br>Fax: (281) 488-8867<br><br>Attorneys for Plaintiffs | EMERSON POYNTER LLP<br>Scott E. Poynter, Esq.<br>scott@emersonpoynter.com<br>Christopher D. Jennings, Esq.<br>cjennings@emersonpoynter.com<br>500 President Clinton Ave., Ste. 305<br>Little Rock, AR 72201<br>Tel: (501) 907-2555<br>Fax: (501) 907-2556<br><br>Attorneys for Plaintiffs |
| JIGARJIAN LAW OFFICE<br>Robert A. Jigarjian, Esq. (SBN: 171107)<br>jigarjianlaw@gmail.com<br>128 Tunstead Avenue<br>San Anselmo, CA 94960<br>Tel: (415) 341-6660<br>Fax: (415) 459-6816<br><br>Attorneys for Plaintiffs | BRANSTETTER STRANCH &<br>JENNINGS PLLC<br>James G. Stranch, III, Esq.<br>jims@branstetterlaw.com<br>J. Gerard Stranch, IV, Esq.<br>gerards@branstetterlaw.com<br>Michael G. Stewart<br>mikes@branstetterlaw.com<br>227 Second Avenue North, 4th Floor<br>Nashville, TN 37201-1631<br>Tel: (615) 254-8801<br>Fax: (615) 250-3937<br><br>Attorneys for Plaintiffs |
| LEWIS BRISBOIS BISGAARD &<br>SMITH LLP<br>Roy M. Brisbois, Esq.<br>brisbois@lbbslaw.com<br>Eric Y. Kizirian, Esq.<br>kizirian@lbbslaw.com<br>221 N. Figueroa Street, Suite 1200<br>Los Angeles, CA 90012<br>Tel: (213) 250-1800<br>Fax: (213) 250-7900<br><br>Attorneys for Defendant Carter's, Inc. | GOLDBERG SEGALLA LLP<br>David S. Osterman, Esq. (*Pro Hac Vice*)<br>dosterman@goldbergsegalls.com<br>301 Carnegie Center Blvd., Ste. 101<br>Princeton, NJ 08540<br>Tel: (609) 986-1300<br>Fax: (609) 986-1301<br><br>Attorneys for Defendant Carter's, Inc. |

| | |
|---|---|
| DRINKER BIDDLE & REATH, LLP<br>Steven M. Selna, Esq.<br>Steven.selna@dbr.com<br>Beth O. Arnese, Esq.<br>Beth.arnese@dbr.com<br>50 Fremont Street, 20th Floor<br>San Francisco, CA  94105<br>Tel: (415) 591-7500<br>Fax: 415) 591-7510<br><br>Attorneys for Defendant Avery<br>Dennison, Inc. | |