**LINK: 172**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

LINDSEY WEBB, et al.,

             Plaintiffs,

     v.

CARTER'S INC., et al.,

             Defendants.

)
)
)
)
)
)
)
)
)
)

**Case No. CV 08-7367 GAF (MANx)**

**ORDER RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I. INTRODUCTION

Plaintiffs Lindsey Webb, Anastasia Booth, Kina Abrams, Jayme Sanchez, Amy Muir, and Nancy Muir (collectively, "Plaintiffs") bring this putative nationwide class action lawsuit against defendants Carter's, Inc. ("Carter's"); Avery Dennison, Inc. ("Avery"); Pacific Concept Industries (USA), LLC ("PCI USA"); and Pacific Concepts Industries Limited ("PCI Hong Kong").[1] (Docket No. 144, Fourth Amended Complaint ("FAC").) This suit arises out of an alleged failure to disclose and provide adequate warnings that various infant and children's tagless clothing that Defendants designed, manufactured, distributed, and sold to the public had failed tests which showed that the tags contained toxic chemicals that could cause adverse skin reactions. (Id. ¶ 1.)

---

[1]On November 23, 2010, the Court quashed service on PCI Hong Kong and ordered Plaintiffs to properly serve that defendant if they wish to proceed with claims against it. (Docket No. 228, 11/23/10 Order.)

1  Plaintiffs bring claims for unfair and fraudulent business practices in violation of

2  California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et

3  seq.; for breach of implied warranties; for breach of the Magnuson-Moss Act; for

4  violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ.

5  Code § 1750 et seq.; for misleading and untrue advertising in violation of

6  California's Fair Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et

7  seq.; and for fraudulent concealment.  (FAC ¶¶ 244–325.)

8      Presently before the Court is Plaintiffs' Motion for Class Certification.

9  (Docket No. 172.)  For the reasons set forth below, the Court **DENIES** the

10  motion.

11                              **II.  FACTS**

12  <u>A. **PLAINTIFFS' ALLEGATIONS**</u>

13      **1. BACKGROUND FACTS**

14      Carter's makes children's clothing, which it sells through its own retail

15  stores and through major retailers like Target.  (FAC ¶ 3.)  Beginning in 2006,

16  Carter's began using a "tagless" label, which is a heat-transferred, ink-based

17  image that is permanently transferred onto fabric.  (Docket No. 246, Amended

18  Declaration of Steven J. Simerlein ("Am. Simerlein Decl."), Ex. 3 [Deposition of

19  James ("Eidson Depo.")] at 33:3–17, 37:24–38:20.)  Carter's designs its labels

20  and uses other companies to supply them.  (Id. at 89:20–25.)  It relied on Avery,

21  PCI USA and PCI Hong Kong, and non-party Inter-Trend Global Packaging Co.

22  to provide the 110 million labels it used for its Fall 2007 line.  (Id. at 268:8–15.)

23  Of these, Avery produced about 90 percent.  (Id.)

24      Carter's began production of its Fall 2007 line in December 2006, and

25  the garments became available in stores beginning in May 2007.  (Am.

26  Simerlein Decl., Ex. 5 at ESI-121412; FAC, Ex. F at 18.)  The tagless labels in

27  the Fall 2007 line were a large, multi-colored, solid block of ink, instead of a

28  smaller, single-color stenciled design of the type previously used.

According to Carter's, each label vendor uses its own proprietary ink formulation, printing methods, and label backing material.[2]  (Docket No. 195, Declaration of James Eidson ("Eidson Decl.") ¶ 6.)  This means that, for the Fall 2007 line, "there are thousands of possible combinations of garment style, production facility, label manufacturer, and manufacturing process."  (Carter's Opp. at 5.)

## 2. CLAIMED VIOLATIONS

Plaintiffs allege that they purchased infant clothing from Carter's Fall 2007 line that contained heat-transferred tagless labels made by Avery, PCI USA, and PCI Hong Kong.  (FAC ¶ 6.)  Plaintiffs claim that the labels contain excessive quantities of chemicals that pose a risk to children's skin, and that Defendants knew about the chemicals and their risks but did not inform the public.  They further allege that these tagless labels contained chemicals that caused their infant children to suffer skin irritations of varying degrees.  (Id. ¶¶ 47–49, 52–54, 59–60, 67–68, 76, 79.)  For instance, the label caused a sore between the shoulder blades of Webb's and Sanchez's children, which made it hard for them to sleep on their backs, the position recommended to avoid Sudden Infant Death Syndrome.  (Id. ¶¶ 47–48, 52–53.)  Sanchez's child developed pus-filled sores that would burst and scab over.  (Id. ¶ 54.)

### a. Testing and Chemicals Present in Labels

Plaintiffs claim that neither Carter's nor Avery ensured that the Fall 2007 tagless design was safe for use in children's clothing, and that Carter's did not ensure that its tagless labels met its own internal standards for acceptable chemical levels.

---

[2] Plaintiffs object to this evidence.  (Docket No. 217-1.)  Because the Court does not rely on this evidence in deciding the merits of the motion for class certification, the objection is **OVERRULED**.  Accordingly, Carter's ex parte application for leave to file a response to Plaintiffs' objections (Docket No. 235) is also **DENIED**.

Plaintiffs also put forth evidence that Carter's knew about the presence of toxic chemicals before consumers started to complain. In February 2007, Carter's received a test report from Inter-Trend showing that the labels contained 0.11 percent phthalates, 0.01 percent more than allowable under Carter's internal standards. (Am. Simerlein Decl., Ex. 21, 23.) A Carter's representative accepted this test as "a PASS" and notified the vendor that the phthalates test would be required in the future only for parts children could place in their mouths. (Am. Simerlein Decl., Ex. 23.) In addition, Avery provided Carter's with test results before July 31, 2007, showing that the tagless labels it produced for the Fall 2007 product line contained DEHP. (Am. Simerlein Decl., Ex. 7, at 5.)

Plaintiffs also allege that Avery knew about the ink's toxicity. In March 2007, Avery received a report from Intertek that the ink in the labels contained 13 percent DEHP, 14 percent PVC, and 2 percent epoxy resin by weight. (Am. Simerlein Decl., Conf. Ex. 1 at 2.) This report, however, noted that, in the quantities present on the labels, "no data . . . indicate that the ingredients . . . would be expected to cause significant acute or chronic toxicity via dermal contact." (Id.)

Avery also had a U.S. Department of Labor Material Safety Data Sheet (MSDS) that indicated that the ink used in the tagless labels could cause "irritation, defatting, or dermatitis." (Am. Simerlein Decl., Ex. 34 at AD-105–06; Ex. 8 [Deposition of Forrest Kelly Browning] at 40:10–41:18.) In January 2007, Avery also received a report showing that the Carter's heat-transferred labels contained 23.6 ppb of formaldehyde. (Am. Simerlein Decl., Ex. 35.) According to Plaintiffs, this exceeded Avery's standard of 20 ppb for children under 36 months. (Mem. at 8.)

### b. Consumer Complaints and Carter's Response

By early November 2007, Carter's had received complaints about the

tagless labels.  (FAC, Ex. F at 17–18.)  In response, Carter's took a number of steps.  Carter's quickly redesigned the labels to include less ink.  (Am. Simerlein Decl., Ex. 51 [email exchange] at 3.)  Carter's also reviewed the earlier testing of the labels, and confirmed that they all had passed.  (Id. at 117:23–118:15.)  It also did new tests on returned garments to see what could have caused the skin problems.  (Am. Simerlein Decl., Ex. 50 at 1–2.)[3] Cater's also hired temporary workers to process returns of garments with the tagless labels, and those workers remained until March 2010, by which time returns had abated.  (Am. Simerlein Decl., Ex. 43 [Deposition of Mary J. Wiedenhaft] at 99:5–11, 101:6–11.)  Carter's estimates that it received 3400 consumer complaints as of January 2010.  (Am. Simerlein Decl., Ex. 3 [Eidson Depo.] at 185:5–13, 191:24–25.)  As of October 1, 2010, 9,828 consumers had returned 158,128 garments.  (Cleveland Decl. ¶ 8.)

### c. The NAMSA Tests

In December 2007, Avery requested North American Science Associates, Inc. ("NAMSA") to conduct cytotoxicity tests on three tagless label samples.  (Am. Simerlein Decl., Ex. 57.)  A sample article failed one of these tests, as it "showed evidence of causing moderate cell lysis or toxicity."  (Id. at NAMSA 60.)  An Avery scientist that received the failed NAMSA test, Dong T-Tsai Hsieh, concluded that the test sample was "contaminated somehow" because it differed from other test results.  (Am. Simerlein Decl., Ex. 32 [Hsieh Deposition] at 52:4–22.)  NAMSA reported that the test system was not responsible for the test failure and noted that "[c]lient acknowledged results.

---

[3]Carter's reviewed its vendor records and confirmed that Avery had produced most of the labels, but further confirmed that PCI had manufactured some of the labels in returned garments.  (Id. at 119:4–9; Am. Simerlein Decl., Ex. 55.)

Client did not request a replacement test."[4]  (Am. Simerlein Decl., Ex. 60 at NAMSA 431.)  Avery, however, claims that it ordered a re-test, which showed no evidence of cell lysis or toxicity.  (Avery Opp. at 4.)  Hsieh stated in a declaration that he received a re-test of "sample article 110-503," but his declaration is unclear as to whether the specific item or just "identical tagless samples from the same batch" were retested.  (Docket No. 134, Hsieh Decl. ¶¶ 6–7.)  Carter's claims it did not find out about the failed NAMSA test until discovery.  (Carter's Opp. at 9 n.2.)  In any event, no defendant ever publicly disclosed the failed NAMSA test.  Later testing by Amec Geometric relied on an Intertek report and NAMSA's testing, but not the failed test.  (Am. Simerlein Decl., Ex. 61 at AD 409, 411.)

In March 2008, Carter's requested vendor confirmation that "all products produced for Carter's comply with the acceptable limits set by Carter's for products containing PVC and phthalates," i.e. no greater than "0.1% by mass.  (Am. Simerlein Decl., Ex. 63.)  Avery responded that its labels contain 15 percent PVC and 14 percent phthalate by weight.  (Am. Simerlein Decl., Conf. Ex. 5.)

In early summer 2008, Carter's Director of Consumer Affairs, Janelle Cleveland, suggested putting something on the company's website about the tagless labels, but VP of Quality Jim Eidson responded that he "did not feel there was a need to do that."  (Am. Simerlein Decl., Ex. 64 [Deposition of Janelle Cleveland] at 60:19–62:7.)

### d.  CPSC Involvement

In late winter or early spring 2008, Carter's Director of Quality

---

[4] On December 9, Avery filed an objection to this evidence as hearsay and lacking foundation. (Docket No. 239.)  Because the actual truth of whether Avery ordered a re-test is relevant to the merits, and not to the class certification question presently before the Court, the objection is **OVERRULED** for purposes of this motion.

1    Assurance, Eric Tarnow, provided the Consumer Product Safety Commission

2    (CPSC) with sample garments.  (Am. Simerlein Decl., Ex. 65 [Deposition of Eric

3    Tarnow]  at 70:18–71:25.)  In September 2008, the CPSC, which had received

4    some consumer complaints about the Fall 2007 line, indicated it wanted to

5    issue a statement warning the public about the tagless labels.  (Id. at

6    89:14–23.)  Later that month, Carter's provided the CPSC a full report on the

7    tagless labels.  (Am. Simerlein Decl., Ex. 66.)  By then, approximately 100.75

8    million garments from the Fall 2007 line were in the hands of consumers.  (Id. at

9    CAR 3212.)  The report indicated that the tagless labels were supplied by Avery

10   only, reported that "[a] small percentage of consumers have reported that young

11   infants developed localized rashes," and noted that the label was discontinued

12   "[f]or design reasons."  (Id. at CAR 3205, 3207, 3209.)  At that time, Carter's

13   reported it had received 259 reports of rashes, which represented 2.4 reports

14   for every 1 million products shipped.  (Id. at CAR 3209.)  Two days after

15   receiving the report, the CPSC asked Carter's to provide the test reports and

16   consumer complaints.  (Am. Simerlein Decl., Ex. 69.)

17   ### d. Public Statements

18        On October 23, 2008, Carter's and CPSC issued a joint public statement

19   about the tagless labels.  (Am. Simerlein Decl., Ex. 54 [Interrogatory

20   Responses], Ex. A [Summary of Carter's Public Statements].)  The statement

21   indicated that some babies had developed rashes after wearing clothes with the

22   tagless labels, but did not specify the chemicals contained in the labels.  (Id.)

23   After release of the statement, reports of injuries from consumers "greatly

24   increased."  (Am. Simerlein Decl., Ex. 65 [Harnow Depo.] at 116:7–10.)

25        In November 2008, Carter's CEO, Michael Casey, gave an interview to

26   the ZRecommends website.  (FAC, Ex. F.)  In this interview, he indicated that

27

28

Carter's had redesigned the labels for "aesthetic" reasons.[5]  (Id. at 18.)  He also

indicated that the company had tested samples and found "nothing in that label

. . . that could cause that kind of irritation.  (Id. at 19.)  Thus, they concluded it

was a "rare allergic reaction in some babies with highly sensitive skin."  (Id.)  He

also indicated that Carter's had shown photos of the rashes to "physicians,"[6] the

first of which had concluded it was contact dermatitis.  (Id.)  The same article

reported Cleveland, of Carter's Consumer Affairs department, as stating that

the standard labels did not exceed limits for Azo dyes, heavy metals or lead,

and "never contained formaldehyde."  (Id. at 18.)

In October and November 2008, Carter's also had a statement on its

website that it had received some reports of allergic reactions to the tagless

labels.  (Am. Simerlein Decl., Ex. 54, Ex. A.)  The statement indicated that the

company had reviewed the products and test results and concluded that the

labels did not contain "any known skin irritants or abrasive chemicals, or that

such a rash is anything beyond a rare allergic reaction to an otherwise safe

product."  (Id.)  The statement advised consumers they could return any product

they were not satisfied with for a full refund.  (Id.)

Shortly after the CPSC statement came out, Avery released a statement

acknowledging the report and noting that Carter's had received complaints of

fewer than four rashes per 1 million garments sold.  (Am. Simerlein Decl., Ex.

72.)  The statement did not disclose any chemicals used in the labels, or the

fact that phthalates "have been implicated in some reproductive abnormalities in

---

[5] Plaintiffs contend that this was misleading because they actually changed the labels
because of the rashes. (Mem. at 16.)  However, the evidence indicates that Carter's did
change the labels for aesthetic reasons, but then added additional modifications to
minimize the risk of skin reactions.  (See Am. Simerlein Decl., Ex. 53 [Deposition of
Michael Casey] at 82:2–20.)

[6]Plaintiffs object that Carter's only informally contacted one doctor, Dr. Strum.  (Mem.
at 17.)

rats," as one of Avery's technical directors had reported internally a few weeks before the statement was issued.  (Id.; Am. Simerlein Decl., Ex. 30 at AD 55301.)

### e.  Refund Policy

Carter's allows dissatisfied consumers to return products for a refund. Typically, Carter's provides full refunds to consumers with receipts, or a refund at the lowest price the item was sold for when a consumer does not have a receipt.  (Declaration of Brian R. Tinkham, Ex. B. [Deposition of Michael Casey ("Casey Depo.")] at 147:1–10.)  They changed the policy, however, for families concerned about the tagless labels.  (Id. at 147:6–10.)  For garments from the Fall 2007 line, consumers without proof of purchase who report a skin reaction get a refund at the full Manufacturer's Suggested Retail Price.  (Docket No. 196, Declaration of Janell Cleveland ("Cleveland Decl.") ¶ 5.)  These consumers also get an additional gift, usually a teddy bear, and reimbursement for out-of-pocket medical costs.  (Id. ¶¶ 5, 7.)  Carter's requires documentation only if those costs exceed $250.  (Id. ¶ 7.)  Consumers without receipts who do not report a skin reaction can get a refund at the highest price charged in Carter's own outlet stores.  (Id. ¶ 5.)  This policy was apparently in place before this lawsuit was filed.  (Casey Depo. at 149:17–150:4.)

As of October 1, 2010, 9,828 consumers obtained refunds pursuant to this policy.  (Cleveland Decl. ¶ 8.)  Of these, 3,400 reported skin problems.  (Id.) In all, consumers returned 158,128 tagless garments.  (Id.)

## B.  THE PROPOSED CLASSES

Plaintiffs identify three classes in their motion for class certification. (Mem. at 2.)  First, they bring claims under the UCL and CLRA against Avery[7]

---

[7] In their motion, Plaintiffs claim that they also assert an FAL claim against Avery. (Mem. at 2.)  The Fourth Amended Complaint, however, asserts an FAL claim only against Carter's.  (FAC ¶¶ 293–302.)

on behalf of "all persons in the United States who purchased and/or acquired Carter's infant apparel products with tagless labels made for the Fall 2007 line." (Id.)  They denominate this class "the Nationwide Class."  (Id.)  Second, they bring claims under the UCL and CLRA against Carter's, PCI USA, and PCI Hong Kong, FAL claims against Carter's[8], and fraud claims against all defendants on behalf of "all persons in California who purchased and/or acquired Carter's infant apparel products containing tagless labels made for the Fall 2007 line." (Id.)  They denominate this class "the California Class."  (Id.)  Finally, Plaintiff Webb also brings a claim for breach of California's implied warranty of merchantability against Carter's on behalf of herself and a subclass of "all persons within the California Class who purchased garments from the Fall 2007 line from a Carter's outlet and/or Carter's retail store."  (Id.)  They denominate this class "the California Sub-Class."  (Id.)

### III.  DISCUSSION

**A. STANDING**

Before considering whether Plaintiffs' proposed classes meet the requirements of Federal Rule of Civil Procedure 23, the Court must determine whether the members of the proposed class have Article III standing.  Although there is no controlling authority requiring absent class members, as opposed to the named plaintiffs, to satisfy Article III's standing requirements, the Court is persuaded by authority indicating that they must.  In Burdick v. Union Security Insurance Co., Judge Collins concluded that absent class members, like the class representatives, must have standing.  Burdick v. Union Sec. Ins. Co., 2009 WL 4798873, *3 (C.D. Cal. Dec. 9, 2009).  In reaching this conclusion, Judge Collins pointed to the Supreme Court's decision in Reno v. Catholic

---

[8] In their motion, Plaintiffs also claim to assert an FAL claim against PCI USA and PCI Hong Kong.  (Mem. at 2.)  The Fourth Amended Complaint, however, asserts an FAL Claim only against Carter's.  (FAC ¶¶ 293–302.)

1  Social Services, Inc., 509 U.S. 43 (1993), which allows the federal courts to

2  exercise jurisdiction over the claims of class members only if those claims are

3  ripe.  Id. at *3.  Judge Collins also pointed to other cases indicating that classes

4  should be defined so as to exclude members lacking standing.  Id. at *4 (citing

5  Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006); O'Neill v.

6  Gourmet Sys. of Minn., Inc., 219 F.R.D. 445, 451–52 (W.D. Wis. 2002);

7  Sanders v. Apple, Inc., 2009 WL 150950, at *10 (N.D. Cal. 2009)).  Finally,

8  Judge Collins noted that requiring class members to have standing comports

9  with the Supreme Court's admonition to be "mindful that Rule 23's requirements

10  must be interpreted in keeping with Article III constraints."  Id. (quoting Amchem

11  Prods., Inc. v. Windsor, 521 U.S. 591, 612–13 (1997)).

12       The Court acknowledges that a leading treatise, Newberg on Class

13  Actions, indicates that absent class members need not make a showing of

14  standing.  Newberg on Class Actions § 2:7.  This treatise, however, also

15  suggests that members of a proper class will necessarily have standing,

16  because the class representative's claims must be "typical" of those of the

17  class.

18       Further, contrary to Plaintiffs' contention, the California Supreme Court's

19  decision in In re Tobacco II, 207 P.3d 20 (Cal. 2009), does not establish that

20  absent class members in a federal class action need not have Article III

21  standing.  In that case, the California Supreme Court considered the effect of

22  Proposition 64, a voter initiative that amended the UCL to allow private suit only

23  by a plaintiff "who has suffered injury in fact and has lost money or property as

24  a result of . . . unfair competition."  Id. at 25.  Previously, the UCL had allowed

25  suit by any private party.  The court considered whether that new requirement

26  applied only to the named plaintiff or also to all absent class members.  Id. at

27  25.  The court concluded, based on the language of the initiative, that only the

28  named plaintiff needed to show such an injury in fact.  Id.  Individuals could

remain part of the class even if they had suffered no injury in fact.  Id. at 35.

That case, however, was in state court and did not address federal courts'

standing requirements.  Before the enactment of Proposition 64, uninjured

plaintiffs could bring UCL claims in state court, but not federal court.  See, e.g.,

Seibels Bruce Group, Inc. v. R.J. Reynolds Tobacco Co., No. C-99-0593 MHP,

1999 WL 760527 at *6 (N.D. Cal. Sept. 21, 1999) (holding that plaintiff did not

have standing to assert UCL claim in federal court because it did not establish a

distinct and palpable injury); Boyle v. MTV Networks, Inc., 766 F. Supp. 809,

817-18 (N.D. Cal. 1991) (noting that case involving private-party UCL claim

could not be removed as it would result in lack of standing).  Tobacco II

established that Proposition 64 changes this for named plaintiffs, but not for

absent class members.  It did not, and could not, hold that uninjured parties

could be class members in a class action brought in federal court, despite their

lack of Article III standing.  Tobacco II therefore does not persuade the Court

that a class action can proceed even where class members lack Article III

standing.

        Plaintiffs respond that the proposed class should nonetheless be

certified because all class members have standing.  To have standing, a

plaintiff must have suffered a concrete and particularized, actual or imminent

"injury in fact"; there must be a causal connection between the injury and the

complained-of conduct; and it must be likely that a favorable decision will

redress the injury.  Renee v. Duncan, 623 F.3d 787, 796–97 (9th Cir. 2010)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)) (internal

quotations omitted).  Plaintiffs contend that all members of the proposed

classes—consisting of people who "purchased and/or acquired" the clothes,

even if their children suffered no adverse reaction—have suffered the "injury in

fact" of having "paid good money for garments that were defective and not fit for

market by Carter's and Avery's own standards."  (Reply at 17.)  The Court is not

1  persuaded.

2          At the outset, those class members who "acquired," rather than

3  "purchased," the garments plainly did not suffer any injury from "pa[ying] good

4  money" for defective goods.  Further, even those class members who did spend

5  money on the garments did not suffer a cognizable injury supporting standing.

6  Plaintiffs' claim of injury rests on their theory that purchasers lost the benefit of

7  their bargain because they parted with money for a defective product.  That

8  argument fails in the present context.  As noted above, the overwhelming

9  majority of children who wore the garments suffered no adverse effects and

10 Plaintiffs have failed to show that the levels of chemicals in the clothes

11 exceeded standards established by law.[9]

12          The cases Plaintiffs rely on in support of their "paid good money"

13 argument are readily distinguishable.  Plaintiffs cite to Wolin v. Jaguar Land

14 Rover North America LLC, 617 F.3d 1168 (9th Cir. 2010), which reversed the

15 denial of class certification for a class comprised of all people who had bought a

16 vehicle with an alignment geometry defect that caused premature tire wear,

17 regardless of whether their tires had not yet worn prematurely.  Id. at 1170–71.

18 The defect was such, however, that the injury was inevitable and would require

19 earlier than normal tire replacement.  But that was not the point of the decision.

20 Rather, in its decision to reverse the denial of class certification, the court

21 focused only on commonality, predominance, typicality, and superiority, and did

22 not address the standing of absent class members at all.  This case therefore

23 provides no support for Plaintiffs' standing argument.

24          Plaintiffs also rely on Cole v. General Motors Corp., in which the Fifth

25 Circuit held that the loss of value of, or overpayment for, a defective good

26

27  _____

    [9]The Court notes that Plaintiffs present evidence that the clothing did not meet Carter's own
28  standards, but in the present context, that is not sufficient to establish a cognizable defect that
    deprived the purchasers of the benefit of their bargain as discussed further in the text.

1   amounted to an economic loss supporting standing.  Cole v. Gen. Motors Corp.,

2   484 F.3d 717, 722 (5th Cir. 2007).  There, the court held that plaintiffs had

3   standing where they sought to recover for purchasing cars with defective side

4   airbag sensors, even though plaintiffs' side airbags had never actually

5   inadvertently deployed.  Id.  Because the products were defective at the time of

6   sale, those plaintiffs alleged a cognizable injury in overpayment, loss in value,

7   or loss of usefulness.  Id. at 723.  Unlike in that case, however, the alleged

8   defect here does not affect all consumers.  Rather, for babies without sensitive

9   skin, the families have enjoyed the full benefit of the clothes and do not face a

10  constant risk that the defect might cause some harm.

11          An alleged defect that, like the alleged defect here, did not present a

12  constant risk of harm was found not to amount to an injury supporting standing

13  in a recent Ninth Circuit case, Birdsong v. Apple, Inc., 590 F.3d 955, 961 (9th

14  Cir. 2009).  In Birdsong, the Ninth Circuit held that plaintiffs who bought iPods

15  that allegedly had an inherent risk of causing hearing loss did not suffer an

16  economic harm.  Birdsong v. Apple, Inc., 590 F.3d 955, 961 (9th Cir. 2009).

17  There, the plaintiffs claimed that the defect caused their iPods to be worth less

18  than they paid for them.  Id.  The court concluded that this claimed defect did

19  not amount to a loss of money or property under the UCL because it was not a

20  "cognizable defect"; it rested on a merely hypothetical risk of hearing loss to

21  other consumers who might use their iPods at high volumes, and the safety

22  benefit was not part of the bargain in the first place.  Id.

23          Relying in part on Birdsong, Judge Wilken concluded that plaintiffs

24  bringing UCL claims against the maker of frozen pot pies that were potentially

25  contaminated had no standing.  Meaunrit v. The Pinnacle Foods Grp., LLC,

26  2010 WL 1838715, at *1 (N.D. Cal. May 5, 2010).  Judge Wilken concluded

27  that, as in Birdsong, the plaintiffs' injuries were merely hypothetical, as they did

28  not allege that the frozen foods were actually contaminated.  The economic

injury—paying for pot pies that the plaintiffs then discarded—was caused not by the defendant, but by the plaintiffs' own decision to discard the pies. Id. at *3. Judge Wilken distinguished a case where a plaintiff had bought a defective stroller that presented an imminent or unmitigable risk of harm, concluding that the plaintiffs in her case did not allege that the defendant's products were actually dangerous. Id. at *3. Similarly, here, Plaintiffs have not alleged that the clothing is actually dangerous for those babies who have suffered no adverse reaction. Where the babies have not reacted, they do not likely face any imminent risk of harm. And where they have been able to use the clothes without incident, the purchasers have not suffered any economic loss.

Plaintiffs fare no better with their claim against Carter's for breach of the implied warranty of merchantability on behalf of the California sub-class. Under California law, any contract for the sale of goods includes an implied warranty that the goods are merchantable, that is, that they would "[p]ass without objection in the trade." Cal. Comm. Code § 2314. Where a product is not "of the same quality as those generally acceptable in the trade," the implied warranty is breached. See CACI No. 1231. To make out a claim, however, a plaintiff must also show that she was harmed, and that the failure of the product to have the expected quality was a substantial factor in causing that harm. See Andrade v. Pangborn Corp., No. 02-3771, 2004 WL 2480708, at *23 (N.D.Cal. Oct. 22, 2004) (citing CACI No. 1231). Contrary to Plaintiffs' suggestion, the buyer does not suffer an injury from the defect itself, and his injury is not properly characterized as the deprivation of his right to take a product free from defect. Rather, a plaintiff can recover for breach of an implied warranty only if the product "contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product." Hicks v. Kaufman & Broad Home Corp., 107 Cal. Rptr. 2d 761, 768 (Ct. App. 2001). Here, plaintiffs have not shown that the product is "substantially certain" to result in skin irritation. To

15

the contrary, the evidence shows that only a very small percentage of children experienced any negative reaction to the tagless labels.  Plaintiffs therefore cannot show that the proposed class members suffered an injury that would allow them to press a claim for breach of the implied warranty of merchantability.  They therefore have not shown that those class members suffered a cognizable injury sufficient to give them Article III standing.

For these reasons, the Court concludes that the members of the proposed classes lack standing.  On this basis alone, the Court must deny the motion for class certification.

## B. RULE 23'S REQUIREMENTS

Even if the members of the proposed classes did have Article III standing, the Court would deny class certification because the classes do not meet the requirements for certification under Federal Rule of Civil Procedure 23.

### 1. STANDARD FOR CLASS CERTIFICATION

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect the rights of persons who might not be able to present claims on an individual basis."  Haley v. Medtronic, Inc., 169 F.R.D. 643, 647 (C.D. Cal. 1996) (citing Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983)).

The Federal Rules of Civil Procedure authorize class action litigation where Rule 23's requirements are met.  Federal Rule of Civil Procedure 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  To certify a class action, plaintiffs must first show that the elements of Rule 23(a) have been met.  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).  If the district court finds that the action meets the prerequisites of Rule 23(a), the court must then consider whether the class is maintainable under Rule 23(b).  Id.

Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3).  Rule 23(b)(2) allows a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(3) allows a class action where "the court finds [(1)] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [(2)] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).  The predominance inquiry measures the relative weight of the common and individualized issues.  Id.  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) (quoting Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)).

In assessing superiority of class adjudication, a court should consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser, 253 F.3d at 1189 (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (hereinafter "Wright & Miller") § 1778 (2d ed. 1986)).

### 2. APPLICATION OF RULE 23 REQUIREMENTS

The Court is not concerned about Plaintiffs' satisfaction of Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.  Plaintiffs, however, have not satisfied Rule 23(b)(3)'s requirements that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action [be] superior to other available methods for fair and efficient adjudication of the controversy."[10] See Fed. R. Civ. P. 23(b)(3).

#### a. Predominance of Common Issues

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." See Valentino, 97 F.3d at 1234.  Thus, the Court must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." Wright & Miller § 1778.  For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement—the predominance inquiry under Rule 23(b) is more rigorous. Windsor, 521 U.S. at

[10] In the alternative, Plaintiffs also seek certification under Federal Rule of Civil Procedure 23(b)(2), which allows class actions for claims for injunctive relief.  The Court does not separately address the propriety of certification under Rule 23(b)(2) because, as discussed above, class certification must be denied for lack of standing.

624.  The predominance question "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Id. at 623. The Court, therefore, must balance concerns regarding the litigation of issues common to the class as a whole with questions affecting individual class members.  In re Northern District of California, Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847, 856 (9th Cir. 1982).

The Court concludes that individualized issues predominate with respect to each claim for relief asserted in this lawsuit.

### 1. CLRA Claims

To make out a CLRA violation, a plaintiff must show that the defendant committed one of 23 enumerated unlawful practices, including "representing that goods . . . have . . . characteristics, . . . uses, [or] benefits . . . that they do not have," and "representing that goods . . . are of a particular standard, quality, or grade . . . if they are of another."  Cal. Civ. Code § 1770(a).  A plaintiff can only recover, however, if he suffers damage "as a result of" conduct forbidden by the statute.  Id. § 1780(a).  Thus, under the CLRA, a plaintiff must show that a "defendant's deception caused them harm."  Mass. Mutual Life Ins. Co. v. Superior Court, 119 Cal. Rptr. 2d 190, 197 (Ct. App. 2002).

Establishing the first element—that the defendants engaged in conduct prohibited by the statute—is plainly susceptible to common proof, as it focuses on the defendants' actions.

The parties disagree, however, about whether establishing causation is susceptible to class-wide proof.  The CLRA causation element does not necessarily make a claim unsuitable for class treatment.  See Mass. Mutual Life Ins., 119 Cal. Rptr. 2d at 197.  "Causation as to each class member is commonly proved more likely than not by materiality."  Id. (quoting Blackie v. Barrack, 524 F.2d 891, 907 n.22 (9th Cir. 1975)).  Thus, where material

1   misrepresentations are made, "at least an inference of reliance would arise as

2   to the entire class."  Id. (quoting Vasquez v. Superior Court, 484 P.2d 964 (Cal.

3   1971)).  However, where individual issues as to materiality predominate, the

4   record will not permit such an inference.  Id.

5           Here, the parties dispute whether the alleged omissions were actually

6   material, and whether that dispute is susceptible to common proof.  "A

7   misrepresentation of fact is material if it induced the plaintiff to alter his position

8   to his detriment.  Stated in terms of reliance, materiality means that without the

9   misrepresentation, the plaintiff would not have acted as he did."  Id. (internal

10  quotations omitted).  In addition, where the alleged misrepresentation is an

11  omission, a plaintiff must also show she "would have been aware of it" had the

12  omitted fact been disclosed.  Buckland v. Threshold Enters., Ltd., 66 Cal. Rptr.

13  3d 543, 549 (Ct. App. 2007).

14          In general, both of these elements—that the plaintiffs would have been

15  aware of the disclosure and that they would have decided not to buy the

16  garments—are proven with reference to a "reasonable consumer" standard.

17  See In re Apple & AT & TM Antitrust Litig., 596 F. Supp. 2d 1288, 1310–11

18  (N.D. Cal. 2008) ("Materiality depends on a plaintiff showing that had the

19  omitted information been disclosed, a reasonable consumer would have been

20  aware of it and behaved differently." (internal quotations omitted)); Falk v. Gen.

21  Motors Corp., 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007) ("Materiality, for

22  CLRA claims, is judged by the effect on a 'reasonable consumer.'" (citing

23  Consumer Advocates v. Echostar Satellite Corp., 8 Cal. Rptr. 3d 22 (2003))).

24  However, "if the issue of materiality or reliance is a matter that would vary from

25  consumer to consumer, the issue is not subject to common proof, and the

26  action is properly not certified as a class action."  In re Vioxx Class Cases, 103

27  Cal. Rptr. 3d 83, 95 (Ct. App. 2009).  Thus, for example, the California Court of

28  Appeal found that individual issues predominated proposed CLRA class claims

relating to a failure to disclose risks of Vioxx because consumers would differ in what they considered material.  Id. at 98–99.  There, the evidence showed that Vioxx increased the risk of death for only some patients, that some patients would take the drug even knowing about the risks, that some physicians would not have paid attention to statements by the drug manufacturer, and that many factors informed doctors' decisions to prescribe the drug.  Id.  Similarly, in Caro v. Procter & Gamble Co., the California Court of Appeal explained that materiality could not be presumed on a class-wide basis where class members would differ in whether orange juice's "fresh" and "no additives" labels would lead them to believe the juice was premium, where the carton also said "from concentrate."  Caro v. Procter & Gamble Co., 22 Cal. Rptr. 2d 419, 433 (Ct. App. 1993).

Here, Defendants have put forth persuasive evidence that materiality and reliance would vary from consumer to consumer, such that the reasonable consumer standard cannot be applied.  First, Defendants cite to evidence that even the named plaintiffs would not have been aware of disclosures had Carter's made them.  For example, Nancy Muir testified that she never researched children's clothes online before buying them.  (Declaration of Eric Kizirian, Ex. 1 [Deposition of Nancy Muir] at 20:3–25.)  Likewise, Defendants offered expert testimony suggesting that consumers would not likely notice warnings posted in stores or on the clothes themselves prior to purchase. (Kizirian Decl., Ex. 23 [Report of Dr. Christine Wood].)  Because this evidence establishes that awareness of a disclosure would almost certainly vary from consumer to consumer, it shows that the element of reliance cannot be established by the reasonable consumer standard.

Second, Defendants have also put forth evidence that consumers' behavior would vary as to whether they would buy the garments if they saw the disclosure.  Defendants point to expert testimony that a consumer's response

21

1   to a warning will vary based on many factors including, but not limited to, "the

2   perceived likelihood of severe or moderate injury, whether the warning

3   provides information that is substantially new, whether the information conflicts

4   with his/her previous experience." (Kirizian Decl., Ex. 23 [Report of Dr.

5   Christine Woods] ¶ 28.)  Thus, the expert concluded, "[h]ad a warning been

6   provided by Carter's and had it been noticed and read, consumers would not

7   be expected to respond uniformly to the message."  (Id.)

8        In light of this persuasive evidence that materiality and reliance would

9   vary from consumer to consumer, the Court concludes that those elements are

10   not subject to common proof under the reasonable consumer standard and

11   that individual issues predominate with respect to the CLRA claims.

12                    **2.  Claims under the "Unfair" Prong of the UCL**

13        Although Plaintiffs assert a claim under the "unfair" prong of the UCL in

14   their operative complaint (FAC ¶ 245), they do not mention it in their motion for

15   class certification.  The Court addresses it nonetheless.

16        An act or practice is "unfair" under the UCL "if the consumer injury is

17   substantial, is not outweighed by any countervailing benefits to consumers or

18   to competition, and is not an injury the consumers themselves could

19   reasonably have avoided."  Daugherty v. Am. Honda Motor Co., Inc., 51 Cal.

20   Rptr. 3d 118, 129 (Ct. App. 2006).  These elements are susceptible to class-

21   wide proof, and Defendants do not argue otherwise.  Although different

22   consumers experienced different injuries, the Court can consider the aggregate

23   or average injury.  Countervailing benefit is plainly a generalized inquiry, and

24   Defendants make no argument that any consumer could have reasonably

25   avoided the injury alleged here.

26        This, however, means only that Defendants' liability is subject to

27   common proof.  Whether individual class members are entitled to recover on

28   the basis of this liability is not.  As discussed above, unnamed class members

are not permitted to bring a claim in federal court where they cannot establish Article III standing.  Thus, to recover, plaintiffs must show that unnamed class members suffered some injury in fact that gives them standing to bring a UCL claim.  Under their theory, this would require a showing of actual reliance, i.e. that if the chemical information had been disclosed, absent class members would have been aware of it and not bought the garments.  For the reasons explained in the previous section, such reliance is not susceptible to class-wide proof.

### 3. FAL Claims

To make out an FAL claim, a plaintiff must show that a company, with intent to dispose of property, disseminated an untrue or misleading statement about that property, which the company knew or should have known to be untrue or misleading.  Cal. Bus. & Prof. Code § 17500.  These elements all focus on the defendants' conduct and are accordingly susceptible to common proof.

Again, however, this means only that Defendants' <u>liability</u> is subject to common proof.  As with the UCL claim, whether class members are entitled to recover on the basis of this liability is not susceptible to proof on a class-wide basis.  To be sure, the FAL allows recovery without proof of actual reliance. <u>See</u> <u>Sevidal v. Target Corp.</u>, 117 Cal. Rptr. 3d 66, 81–82 (Ct. App. 2010). However, as discussed above, unnamed class members are not permitted to bring a claim in federal court where they cannot establish Article III standing. Thus, even though the FAL itself does not require a showing of reliance, plaintiffs must show that unnamed class members suffered some injury in fact that gives them standing to bring an FAL claim.  As explained in the previous section, establishing such an injury in fact is not susceptible to class-wide proof.

### 4. Claims for Fraudulent Concealment and under UCL's

**"Fraud" Prong**

To make out a fraudulent concealment claim, a plaintiff must show that the defendant intentionally suppressed a material fact that it had a duty to disclose with the intent to defraud the plaintiff, that the plaintiff was unaware of the fact and would not have acted as she did had she been aware of it, and that the plaintiff was injured as a result.  Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC, 76 Cal. Rptr. 3d 325, 332 (Ct. App. 2008).  To make out a claim under the "fraudulent" prong of the UCL, Plaintiffs need only prove that "members of the public are likely to be deceived."  Wang v. Massey Chevrolet, 118 Cal. Rptr. 2d 770, 781 (Ct. App. 2002).

The fraudulent concealment claim is not susceptible to class-wide proof because, for the reasons explained above, whether class members would have been aware of a disclosure and acted differently are individualized inquiries.  Moreover, even though the UCL's "fraudulent" prong does not require proof of reliance, federal standing jurisprudence requires some showing of injury before an unnamed plaintiff can recover.  Thus, that claim is also not susceptible to class-wide proof.

**5. Warranty Claims**

Plaintiffs also pursue warranty claims against Carter's on behalf of the California sub-class of consumers who bought garments directly from Carter's.  They assert a claim for breach of the implied warranty of merchantability and further claim that that breach amounted to a violation of the Magnuson-Moss Act and the UCL's unlawful prong.  Under California law, certain sales of goods give rise to a warranty that the goods will be "fit for the ordinary purposes for which such goods are used" and would "[p]ass without objection in the trade."  Cal. Comm. Code § 2314.  To make out a claim, a plaintiff must show not only that the good did not meet that standard, but also that the plaintiff was harmed, and that the failure of the product to have the expected quality was a

1   substantial factor in causing that harm.  See Andrade, 2004 WL 2480708, at

2   *23 (citing CACI No. 1231).  The presence of a defect, without more, does not

3   establish harm.  See Hicks, 107 Cal. Rptr. 2d at 768.  Here, Plaintiffs cannot

4   establish harm on a class-wide basis.

5        In sum, common questions predominate as to all the claims that

6   Plaintiffs press in this suit.  The proposed classes accordingly do not satisfy

7   Rule 23(b)(3)'s requirement that common issues predominate.

8                              ***b. Superiority***

9        The Court also concludes that a class action would not be a superior

10  method of adjudicating the claims presented here.  In determining whether a

11  class action is superior, the Court looks to factors including:

12       (A) the class members' interests in individually controlling the
         prosecution or defense of separate actions;
13       (B) the extent and nature of any litigation concerning the controversy
         already begun by or against class members;
14       (C) the desirability or undesirability of concentrating the litigation of the
         claims in the particular forum; and
15       (D) the likely difficulties in managing a class action.

16  Fed. R. Civ. P. 23(b)(3).

17       The Court is persuaded that a class action is not superior because

18  Carter's is already offering the very relief that Plaintiffs seek: it allows

19  consumers to obtain refunds for the garments, even without a receipt, and

20  reimburses consumers for out-of-pocket medical costs for treating skin irritation

21  resulting from the tagless labels.  As noted, Carter's will pay up to $250 for

22  medical expenses without requiring any documentation.  Plaintiffs object that

23  Carter's refund policy does not actually promise relief for the vast majority of

24  consumers who are unaware of the policy.  (Reply at 30–31.)  They contend

25  that, by concealing the true facts from the public, Carter's has minimized the

26  availability of refunds, and that a class action with proper notice would provide

27  relief to more people.

28       Although there is no controlling case law, other district court cases

provide guidance.  Often, the extent of public awareness of the refund

programs played an important role in determining whether refund programs

rendered class actions inferior for purposes of Rule 23(b)(3).  In <u>In re</u>

<u>Phenylpropanolamine (PPA) Products Liability Litigation</u>, a district court

reasoned that "[i]t makes little sense to certify a class where a class

mechanism is unnecessary to afford the class members redress."  <u>In re</u>

<u>Phenylpropanolamine (PPA) Prods. Liab. Litig.</u>, 214 F.R.D. 614, 622 (W.D.

Wash. 2003).  There, the defendant offered refunds and product replacement

to consumers who had purchased drugs containing PPA who could provide

proof of purchase.  <u>Id.</u>  The court brushed aside the plaintiffs' concern that

these programs only offered redress to consumers who actively sought it out or

who happened to learn about the refund program on a website.  <u>Id.</u>  The court

concluded that "a significant number of people somehow heard about these

programs," where defendants had given refunds to over 47,000 consumers.

<u>Id.</u>  Moreover, the court noted that the "possible availability of refunds likely

occurred to a number of people" after the FDA widely publicized the withdrawal

of drugs containing PPA.  <u>Id.</u>

  Following this case, a district court in <u>In re ConAgra Peanut Butter</u>

<u>Products Liability Litigation</u> concluded that a class action was not superior

where the defendant already had a voluntary program to refund consumers for

possibly contaminated peanut butter, "in some instances without a proof of

purchase or consumption."  <u>In re ConAgra Peanut Butter Prods. Liab. Litig.</u>,

251 F.R.D. 689, 700–01 (N.D. Ga. 2008).  There, the court emphasized that

"news of [the] refund program ha[d] been widely disseminated and received."

<u>Id.</u> at 700.  The defendant received over 1.3 million calls in the first week after

it announced its recall program.  <u>Id.</u> at 701.  Thus, contrary to those plaintiffs'

objections, the refund program was not "minimal" or "illusory."  <u>Id.</u>

  The Carter's notice to consumers does not appear to be as extensive as

the notice of refunds in the <u>ConAgra Peanut Butter</u> or <u>PPA Products Liability</u> cases.  Carter's CEO testified that the refund policy was communicated on the company's website, in his interview with the website ZRecommends, in the CPSC statement, and "by our consumer affairs group when they interacted with people."  (Docket No. 200, Declaration of Brian R. Tinkham, Ex. B [Casey Depo.] at 149:13–150:4.)  The CPSC statement does not reference the refund policy, however.  (Am. Simerlein Decl., Ex. 54, Ex. A.)  In addition, none of these statements mentions the availability of reimbursement for medical expenses, and only ZRecommends mentions the availability of refunds without a receipt.  (<u>See</u> <u>id.</u>; FAC, Ex. F [ZRecommends Article].)  In addition, unlike in the peanut butter and PPA cases, no well-publicized recall has alerted consumers to the possibility of refunds.  Indeed, there has been no recall, and the only government-agency announcement did not reference the refund policy.  Although 9,828 consumers had obtained refunds for 158,128 garments as of October 1, 2010 (Cleveland Decl. ¶ 8), this represents only a little over 0.14 percent of garments.

The Court, however, concludes that the relatively small number of returns most likely indicates that the majority of consumers are satisfied with the garments they bought.  Thus, as in the <u>PPA Products Liability</u> case, "[t]he fact that consumers have not sought refunds in large numbers may well demonstrate that certification of the proposed class would merely serve to create lawsuits where none previously existed."  <u>In re PPA Prods. Liab. Litig.</u>, 214 F.R.D. at 622.  Because Carter's already offers the very remedy sought in this suit, the Court concludes that a class action is not "superior" within the meaning of Federal Rule of Civil Procedure 23(b)(3).

///

///

///

# IV.  CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion for class certification.

**IT IS SO ORDERED.**

DATED:  February 3, 2011

_____
Judge Gary Allen Feess
United States District Court